[Cite as *State v. Harrell*, 2024-Ohio-981.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2022-CA-50 |
| | : | |
| v. | : | Trial Court Case No. 21-CR-0408(A) |
| | : | |
| OTHELLO HARRELL | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on March 15, 2024

· · · · · · · · · · ·

CARLO C. MCGINNIS, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

· · · · · · · · · · · ·

LEWIS, J.

{¶ 1} Defendant-Appellant Othello Harrell appeals from his conviction in the Clark County Common Pleas Court, following a jury trial, for engaging in a pattern of corrupt activity and two counts of aggravated trafficking in drugs. For the following reasons, we will reverse the judgment of the trial court.

## I. Procedural History and Brief Statement of Facts

{¶ 2} Detectives from the Springfield Police Department received information in June 2020 that Harrell was dealing methamphetamine out of his apartment. An investigation ensued, including using a confidential informant ("CI") to purchase drugs from Harrell on two occasions in July 2020. On August 10, 2020, police obtained a search warrant for Harrell's apartment, and it was executed the following day. Immediately prior to the execution of the search warrant, officers detained Harrell during a traffic stop and confiscated his cell phone. Pursuant to the issuance of a subsequent search warrant, officers obtained the contents of Harrell's cell phone, including numerous text messages between Harrell and other individuals believed to be engaged in the sale and possession of methamphetamines.

{¶ 3} On June 29, 2021, Harrell was indicted by a Clark County grand jury on one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1), a felony of the first degree ("Count One"); one count of aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(2), a felony of the second degree ("Count Two"); one count of aggravated possession of drugs, in violation of R.C. 2925.11(A), a felony of the second degree ("Count Three"); one count of aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(2), a felony of the third degree ("Count Four"); and one count of aggravated possession of drugs, in violation of R.C. 2925.11(A), a felony of the third degree ("Count Five"). The indictment also included a forfeiture specification attached to Counts Two through Five for $3,455 in U.S. currency. These charges were based on the investigation that occurred in the summer of 2020. In total, the indictment contained 122 various counts for eight co-defendants.

{¶ 4} On August 13, 2021, the State filed a certification of non-disclosure of material in accordance with Crim.R. 16(D), identifying certain material, including redacted information in the discovery packet, that would not be disclosed due to the risk of physical harm, intimidation, or coercion of confidential informants. A bill of particulars was also filed by the State.

{¶ 5} On January 21, 2022, Harrell filed a motion to suppress challenging the admissibility of evidence obtained from the searches of his home and cell phone and the lawfulness of his traffic stop and detention, which led to statements allegedly obtained in violation of Harrell's rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Following a hearing on the motion to suppress, the trial court overruled Harrell's motion in its entirety.

{¶ 6} On March 10, 2022, Harrell filed a motion to disclose information regarding cooperating witnesses and informants. The trial court sustained in part and denied in part Harrell's motion. The portions that were denied included information involving the CI and disclosure of the identity of the CI. In particular, any evidence of audio, video, or electronic recordings of the controlled drug purchase, which was alleged in the affidavit for the search warrant involving the CI, was not required to be disclosed to defense counsel until the day of trial.

{¶ 7} On May 2, 2022, Harrell filed a motion for disclosure of the CI and related information, requesting that the State disclose the information at least two weeks prior to trial. That same day, Harrell filed a supplemental motion to suppress regarding pretrial identification. The State filed a response to Harrell's motion for disclosure of the CI and

related information.   The trial court ruled that the State was not required to disclose the identity of the CI until the day of trial.   The trial court also overruled Harrell's supplemental motion to suppress without a hearing on May 20, 2022, finding that it was untimely and that it would not be in the best interest of justice to extend the time limit for filing a pretrial motion to suppress to accommodate the supplemental motion.

{¶ 8} On June 15, 2022, Harrell filed a motion in limine to prohibit the State from introducing any evidence of alleged misconduct involving criminal convictions, alleged criminal conduct, or any other ongoing investigations for which Harrell had not yet been indicted.   That same day, Harrell filed a second motion in limine to prevent the State from introducing testimony of four witnesses the State had listed in its amended witness list, including alleged co-defendants.

{¶ 9} Following the State's response to each of Harrell's motions in limine, the trial court overruled the motions as it related to the four potential witnesses and indicated it would need additional information to rule on whether Harrell's prior convictions were expected to be used before the trial court would issue a ruling.   The trial court further indicated it would consider any of Harrell's objections at trial as to any alleged improper testimony, thus reserving any ruling on the admissibility of other evidence.

{¶ 10} On June 28, 2022, a jury trial commenced detailing the investigation of the Springfield Police Department, including evidence of the two drug buys, the contents of Harrell's cell phone, and testimony from the CI, co-defendants, and law enforcement. Harrell was found guilty as charged on all counts.

{¶ 11} Harrell was sentenced on July 11, 2022.   The court merged Count Three into

Count Two and merged Count Five into Count Four based on the State's election. Harrell was sentenced to an indefinite prison term of 11 to 16½ years for Count One (engaging in a pattern of corrupt activity); an indefinite prison term of 8 to 12 years for Count Two (second-degree aggravated trafficking in drugs); and a definite prison term of 3 years for Count Four (third-degree aggravated trafficking in drugs). The trial court ordered the sentences to be served consecutively for a total indefinite prison term of 22 to 27½ years. The trial court also imposed a mandatory minimum fine for the second-degree felony of $7,500 and a mandatory minimum fine for the third-degree felony of $5,000. Finally, the trial court ordered that $3,455 be forfeited in accordance with the forfeiture specification.

{¶ 12} Harrell filed a timely appeal and raises the following four assignments of error:

I. APPELLANT WAS DENIED HIS DUE PROCESS RIGHTS TO A FAIR TRIAL UNDER OHIO AND FEDERAL CONSTITUTIONS.

II. APPELLANT'S CONVICTIONS FOR COUNT TWO AND COUNT THREE FOR AGGRAVATED TRAFFICKING AND POSSESSION OF DRUGS SHOULD BE REVERSED BECAUSE THEY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND/OR THE EVIDENCE WAS INSUFFICIENT.

III. APPELLANT'S CONVICTION UNDER OHIO RICO STATUTE SHOULD BE REVERSED BECAUSE IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND/OR THE EVIDENCE WAS INSUFFICIENT.

IV. CUMULATIVE EFFECT OF THE MULTIPLE ERRORS IN THIS CASE

VIOLATED APPELLANT'S CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL.

## II. First Assignment of Error

{¶ 13} In his first assignment of error, Harrell raises five sub-arguments under the umbrella claim that he was denied his due process right to a fair trial. These arguments include: 1) the trial court erred in overruling his motions to suppress evidence; 2) the trial court erred in denying his motions requesting disclosure of the CI and additional discovery associated with the CI; 3) the trial court erred in admitting certain evidence at trial; 4) the trial court erred in overruling his motion for a mistrial and Crim.R. 29 motion for acquittal; and 5) the trial court failed to provide adequate jury instructions and responses to jury questions. Because we conclude that the trial court erred in failing to grant one of Harrell's motions to suppress, we need not address his additional due process arguments except for his Crim.R. 29 claim, which we will address as part of his sufficiency of the evidence assignments of error.

{¶ 14} Harrell's first motion to suppress concerned the lawfulness of Harrell's warrantless detention and the seizure of his cell phone. The second motion concerned a pretrial identification of Harrell. We will begin our analysis with the trial court's decision overruling Harrell's January 21, 2022 motion to suppress concerning Harrell's warrantless detention.

### a. Motion to Suppress Regarding the Warrantless Seizure

{¶ 15} On January 21, 2022, Harrell filed a motion to suppress challenging the admissibility of evidence obtained from searches of his home and cell phone and the

lawfulness of his traffic stop and detention, which led to the seizure of his cell phone and statements allegedly obtained in violation of his *Miranda* rights. A hearing was held on the motion to suppress on April 21, 2022, at which Detective Calvin Burch and Officer Paige Rector of the Springfield Police Department testified on behalf of the State. The following is a summary of the testimony and evidence that was presented at the suppression hearing.

{¶ 16} Detective Burch was a seven-year veteran of the Springfield Police Department and was involved in the Drug Investigation Unit in June 2020. Around June 15, 2020, Detective Burch met with a CI, later identified at trial as Amber Yeager, who informed him of a methamphetamine supplier by the name of "Cuz," later identified as Harrell. On June 25, 2020, Yeager provided additional information about Harrell and another individual named Jeremy Barclay, who was later charged as a co-defendant. According to Yeager, Harrell was Barclay's methamphetamine supplier. During Detective Burch's investigation of Harrell, Yeager personally bought methamphetamines from Harrell during two controlled buys that were recorded. The undercover buys were arranged via cell phone, with Harrell's phone number being provided to Detective Burch via Yeager. Based on Detective Burch's own investigation, including the controlled buys, surveillance, talking to additional CIs, and phone records, he believed "Cuz" was Harrell. After showing a photograph of Harrell to Yeager, she confirmed that Harrell was in fact "Cuz."

{¶ 17} On August 10, 2022, Detective Burch obtained a search warrant for 351 and 351½ Ludlow Avenue in Springfield, which were two separate residences but a single structure similar to a duplex. The search warrant did not include specific permission to search Harrell or his vehicle. According to Detective Burch, Harrell appeared to be

primarily staying at 351½ Ludlow Avenue based on Harrell's staying there overnight 5-6 days a week, parking his car there, and coming and going from the residence. The other side of the building, 351 Ludlow Avenue, was associated with Barclay for similar reasons.

{¶ 18} Uniformed officers were assigned to conduct a traffic stop on Harrell immediately prior to the execution of the search warrant on August 11, 2022. According to Detective Burch, it was standard protocol to separate a suspect from the house prior to the execution of a search warrant for officer safety reasons. Detective Burch testified that Harrell had previously been observed with firearms by Yeager, and Detective Burch was aware from his experience that drugs and firearms often go hand in hand. Once Harrell was observed leaving the house, Detective Burch radioed the assisting units to conduct a traffic stop on Harrell. Burch testified that Harrell was stopped about a block-and-a-half or two blocks away from the residence solely for officer safety reasons, and the uniformed officers brought Harrell back so he could be present during the search of the residence.

{¶ 19} Officer Rector testified that on the day of the search, she was working as a uniform patrol officer assigned to road patrol with her partner Officer Hays. The officers were notified that they were to assist the drug unit with their execution of a search warrant by conducting a traffic stop on Harrell once he left the residence. Based on her assignment, Officer Rector conducted a traffic stop on Harrell's vehicle using the police cruiser's lights and siren. There were no traffic infractions or any other violations that occurred prior to stopping Harrell, and the detention was solely based on the fact that the officers were executing a search warrant.

{¶ 20} When the officers approached Harrell's vehicle, they ordered Harrell, the sole

occupant, to step out of the car and informed him that he was being detained in relation to a search warrant. Officer Rector testified that Harrell was removed from the vehicle and detained for officer safety. Officer Rector's partner, Officer Hays, then conducted "a search on [Harrell] to make sure he didn't have any weapons." At some point the officers located a cell phone on Harrell's person, which they confiscated "to separate him from his phone for officer safety reasons." Rector was unable to testify where Harrell's phone had been located, e.g., in his hand or a pocket, other than that it was on his person and not in his car. Rector also explained that it was standard protocol to pat down anyone prior to putting them in a police cruiser and to take anything from them that was in their possession. Harrell was handcuffed, placed in the back of the police car, and driven to 351½ Ludlow Avenue, which was "a couple blocks away" from where he had been stopped.

{¶ 21} After returning Harrell to 351½ Ludlow Avenue, Detective Burch spoke to Harrell, who remained in the back seat of the patrol car, and read him his *Miranda* warnings. Harrell indicated he did not wish to speak to the officers at that time. While at the residence, Harrell consented in writing to a search of his vehicle. Once the vehicle had been searched, Harrell was told he was free to leave, and he left. At no point was Harrell arrested on August 11, 2022, and his phone was not returned to him.

{¶ 22} Following the presentation of evidence at the hearing, the primary question for the trial court was whether the warrantless seizure and subsequent search of Harrell fell within an applicable exception to the Fourth Amendment's warrant requirement. The State argued that the officers had been permitted to detain Harrell in the manner they did based on *Bailey v. United States*, 568 U.S. 186, 133 S.Ct. 1031, 185 L.Ed.2d 19 (2013), which

"allows for that type of protocol for officer safety." Supp. Tr. 58. The State offered no explanation for why officers confiscated Harrell's cell phone without a warrant.

{¶ 23} The trial court found that under *Bailey*, the common practice of the Springfield Police Department to stop a suspect a couple of blocks away from a residence that was the subject of a search warrant was unconstitutional. Nevertheless, the trial court found that Harrell's warrantless detention had been lawful because Officers Rector and Hays had had probable cause to believe that Harrell was engaged in criminal activity. The trial court explained its holding as follows:

> [The officers] were told to make a stop because detectives had obtained a search warrant to search his premises. These officers might not have known the intricacies of the criminal activity in which the defendant was engaged, but they knew it was drug activity since it was the drug unit that had requested their assistance. They also knew, by dint of the fact that a search warrant had just been obtained, that a Judge had just made a probable cause determination that the defendant was engaged in drug activity. These circumstances, and the officers' knowledge of the same, warranted the stop.

Entry (May 3, 2022).

{¶ 24} Harrell argues that the trial court erred in overruling his motion to suppress because his warrantless seizure was illegal, and therefore his cell phone, which was confiscated during the stop and subsequently searched, should have been excluded from evidence as fruit of the poisonous tree. The State, on the other hand, has abandoned its

reliance on *Bailey* and instead attempts to impute the information identified in the search warrant to the seizing officers using the collective knowledge doctrine. Therefore, according to the State, under the totality of the circumstances, the officers had reasonable suspicion, if not probable cause, to believe that Harrell was involved in drug trafficking to justify the investigatory stop and pat-down. We conclude that Harrell's seizure was unconstitutional.

### i. Standard of Review

{¶ 25} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). "An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 16. "Accepting those facts as true, the appellate court must then independently determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied." *State v. Isaac*, 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994). "The application of the law to the trial court's findings of fact is subject to a de novo standard of review." (Citations omitted.) *State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.).

### ii. Warrantless Seizure

**{¶ 26}** "The Fourth Amendment to the United States Constitution, and Section 14, Article I of the Ohio Constitution, protect individuals from unreasonable searches and seizures conducted by police officers." *State v. Ferguson*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153, ¶ 12. "With respect to felony cases, [the Ohio Supreme Court] has interpreted Article I, Section 14 of the Ohio Constitution as providing the same protections as the Fourth Amendment." *State v. Jordan*, 166 Ohio St.3d 339, 2021-Ohio-3922, 185 N.E.3d 1051, ¶ 14, citing *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, ¶ 12. "For violations of the Fourth Amendment, courts are commanded to apply the exclusionary rule, suppressing use of any evidence that was illegally obtained." *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, ¶ 25 (2d Dist.), citing *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**{¶ 27}** "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), citing *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). "Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, absent a few, well recognized exceptions." *State v. Johnson*, 187 Ohio App.3d 322, 2010-Ohio-1790, 931 N.E.2d 1162, ¶ 11 (2d Dist.), citing *Katz*. "One of those exceptions is the rule regarding investigative stops, announced in *Terry* [*v. Ohio*], 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 [(1968)], which provides that a police officer may stop an individual to investigate unusual behavior, even absent a prior judicial warrant or probable cause to

arrest, where the officer has a reasonable, articulable suspicion that specific criminal activity may be afoot." *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 16 (2d Dist.).

**{¶ 28}** Where an officer stops a vehicle and detains its occupants, a "seizure" has occurred within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Once a warrantless seizure is established, the State bears the burden of proving that the warrantless seizure satisfies the reasonableness standards of the Fourth Amendment. *Maumee v. Weisner*, 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999).

### iii. Analysis

**{¶ 29}** In this case, there is no dispute that Harrell was seized for Fourth Amendment purposes at the time the officers stopped his vehicle and, further, that the officers did not have a warrant for his arrest. To justify this warrantless seizure, the State relied on *Bailey*, 568 U.S. 186, 133 S.Ct. 1031, 185 L.Ed.2d 19. According to the State's argument at the suppression hearing, because the officers were executing a search warrant for suspected drug trafficking on Harrell's home and there were concerns for officer safety, *Bailey* permitted the officers to lawfully stop Harrell away from the home. The trial court explicitly rejected this argument, finding that stopping Harrell a couple of blocks away from the residence for officer safety prior to the execution of the search warrant was not permitted under *Bailey*. We agree with the trial court.

**{¶ 30}** In *Bailey*, police obtained a search warrant for an apartment based on a confidential informant's telling police that he had observed a gun while he was at the

apartment to purchase drugs. *Id.* at 190. Prior to executing the warrant, two officers, Detectives Richard Sneider and Richard Gorbecki, who were conducting surveillance on the apartment, observed two individuals who both matched the general description of the alleged drug dealer leave the apartment and get into a car. The officers followed the car for approximately one mile before pulling the vehicle over in a parking lot. The two occupants of the vehicle, Chunon Bailey and Bryant Middleton, were removed from the vehicle and patted down. The officers discovered a key ring in Bailey's pocket and removed it. *Id.* After making statements admitting that Bailey was the resident of the apartment that was being searched, Bailey was informed that he was being detained incident to the execution of a search warrant. Bailey immediately denied living at the apartment and claimed that anything the officers found there did not belong to him. *Id.* at 191.

{¶ 31} Both Bailey and Middleton were driven back to Bailey's residence. By the time the group had returned to the apartment, officers had recovered a gun and drugs in plain view. Both Bailey and Middleton were arrested, and Bailey's keys were seized incident to his arrest; the keys were later verified to access the door of the apartment. *Id.*

{¶ 32} Based on the search, Bailey was charged with multiple federal gun and drug offenses. Bailey filed a motion to suppress the apartment key and statements he made when stopped by police, which Bailey argued were derived from an unreasonable seizure. The trial court overruled Bailey's motion, and Bailey was subsequently convicted following a jury trial. *Id.* at 191-192.

{¶ 33} By the time *Bailey* reached the United States Supreme Court, the sole

question to be determined was whether it had been reasonable to stop and detain Bailey when he was away from the premises to be searched pursuant to a valid search warrant, when the only justification for the detention was to ensure the safety and efficacy of the search. In deciding the issue, the Supreme Court considered its prior decision in *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), which permitted officers executing a search warrant "to detain the occupants of the premises while a proper search is conducted." *Id.* at 705. The reasoning in *Summers* was that the following three important law enforcement interests, taken together, justified the detention of an occupant who was on the premises during the execution of a judicially-authorized search warrant: officer safety, facilitating the completion of the search, and preventing flight. *Id.* at 702-703. With those interests in mind, the *Bailey* Court concluded that none of them applied "with the same or similar force to the detention of recent occupants beyond the immediate vicinity of the premises to be searched." *Bailey* at 199. Thus, "[t]he categorical authority to detain incident to the execution of a search warrant must be limited to the immediate vicinity of the premises to be searched." *Id.* As the Supreme Court explained, "[l]imiting the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification. Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe." *Id.* at 201.

{¶ 34} Although the Supreme Court declined to provide a definition of "immediate vicinity," the Court provided a list of potential factors to consider in determining whether an

occupant was detained within the immediate vicinity of the premises to be searched. These factors include, but are not limited to, "the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, [and] the ease of reentry from the occupant's location[.]" *Id.*

{¶ 35} In this case, Detective Burch and Officer Rector relied solely on the law enforcement interest of officer safety to justify the detention of Harrell. Similar to the situation in *Bailey*, however, Harrell had left the premises to be searched, without knowledge of the search, and he posed little risk to the officers who remained on scene. *See id.* at 195-196. It is apparent from the testimony at the motion to suppress hearing that Harrell was not within the lawful limits of the premises and could not have easily reentered his residence from his location a couple of blocks away. There was no testimony provided to indicate whether Harrell was within the line of sight of his residence or any other evidence to indicate Harrell was within the "immediate vicinity" of his residence at the time officers stopped him. Accordingly, based on the evidence presented, the trial court correctly determined that the officers' detention of Harrell a few blocks away from his residence based solely on the execution of the search warrant and for officer safety was unconstitutional pursuant to *Bailey*. However, this did not end the trial court's inquiry and, likewise, does not end ours.

{¶ 36} As the United States Supreme Court explained in *Bailey*, "[i]f officers elect to defer the detention until the suspect or departing occupant leaves the immediate vicinity, the lawfulness of detention is controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under *Terry,* or an arrest based on

probable cause." *Bailey* at 202. The Court then gave examples of what would be needed to allow the detention once the officer safety justification was rejected:

> A suspect's particular actions in leaving the scene, including whether he appears to be armed or fleeing with the evidence sought, and any information the officers acquire from those who are conducting the search, including information that incriminating evidence has been discovered, will bear, of course, on the lawfulness of a later stop or detention. For example, had the search team radioed Detectives Sneider and Gorbecki about the gun and drugs discovered in the Lake Drive apartment as the officers stopped Bailey and Middleton, this may have provided them with probable cause for an arrest.

*Id.*

{¶ 37} Finally, the Court directed the Court of Appeals on remand to address the trial court's finding that the police officers' stop of Bailey was lawful under *Terry*. *Id.* If the court of appeals agreed that the *Terry* stop was valid, then it was to determine whether the *Terry* stop "yielded information that justified the detention the officers then imposed." *Id.*

{¶ 38} In the present case, the State did not present testimony that Harrell had been pulled over to conduct an investigatory stop under *Terry* or to arrest him based on probable cause. Rather, the State's evidence established that the sole reason the police seized Harrell was to further safety considerations for the other police officers who were going to execute a search warrant of the location Harrell had left. This was expressly prohibited by *Bailey*.

{¶ 39} Although the State made no such argument, the trial court found that Harrell had been lawfully stopped by the police because "Officers Rector and Hayes had more than a reasonable suspicion, but probable cause to believe that [Harrell] was engaged in criminal activity." The basis for the trial court's finding was that the officers who stopped Harrell had been aware that the drug unit was executing a search warrant for Harrell's apartment and, therefore, had probable cause to believe that Harrell had been engaged in drug activity. We do not agree with the trial court's conclusion.

{¶ 40} "The United States Supreme Court has stated that a traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime." (Citations omitted.) *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7. When a police officer conducts a traffic stop based on reasonable articulable suspicion that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment. *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996), syllabus. But if the traffic stop is not based on a perceived traffic violation, as was the case here, then the officer must have either reasonable articulable suspicion or probable cause to believe that the person to be stopped is engaged in, or is about to be engaged in, criminal activity. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889; *State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, 175 N.E.3d 527, ¶ 19.

{¶ 41} "In *Terry*, the United States Supreme Court 'implicitly acknowledged the authority of the police to make a forcible stop of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal

activity.' " *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 19, quoting *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). "Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones*, 70 Ohio App.3d 554, 556-57, 591 N.E.2d 810 (2d Dist.1990), citing *Terry* at 27. Such an investigatory stop "by a police officer must be viewed in light of the totality of the surrounding circumstances." *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus. "The investigatory detention is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions." *State v. Taylor*, 106 Ohio App.3d 741, 748, 667 N.E.2d 60 (2d Dist.1995), citing *Terry*.

{¶ 42} In this case, Harrell was observed leaving his residence, getting into a vehicle, and driving away. The officers did not testify that they suspected him of engaging in any criminal activity at the time he left his home or that any traffic violation was observed. While the trial court noted that the officers were aware that a search warrant was being executed for Harrell's residence and it was the drug unit involved in executing the search warrant, this did not rise to the level of reasonable articulable suspicion to justify Harrell's detention. If that were the case, then officers would be permitted to stop any inhabitant who has left a residence that is about to be searched by a drug unit. That is unreasonable and contrary to *Bailey*. Likewise, the fact that probable cause was found for a search warrant of a residence to be issued is not the same as determining that a particular person

was engaged in, is engaged in, or is about to engage in criminal activity to justify a *Terry* stop. To grant a search warrant for a residence, the reviewing magistrate must decide whether there is sufficient probable cause to believe that "there is a fair probability that evidence of a crime will be found in a particular place." *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 35. Given that the search warrant at issue here sought the search of a place rather than a person, the sufficiency of the probable cause related to the location to be searched, not an individual. Probable cause to search a residence is not synonymous with probable cause to separately detain an individual for suspected criminal activity. As Detective Burch acknowledged, the search warrant was neither for Harrell's person nor his vehicle.

{¶ 43} None of the circumstances preceding the officers' detention of Harrell created a reasonable suspicion that he had just been involved in criminal activity, was involved in criminal activity, or was about to be involved in criminal activity to necessitate a stop for a limited investigation to confirm or dispel that suspicion. Rather, the sole reason for stopping Harrell was that officers were executing a search warrant at his home, which was standard protocol for officer safety. Under *Bailey*, however, that practice was unconstitutional. Accordingly, the officers lacked reasonable articulable suspicion to stop Harrell.

### iv. Collective Knowledge Doctrine

{¶ 44} The State contends that the officers who stopped Harrell had at least reasonable articulable suspicion, if not probable cause, to detain Harrell due to the collective knowledge doctrine. The trial court did not address the collective knowledge

doctrine in its decision, because the State failed to raise this argument before the trial court. "A first principle of appellate jurisdiction is that a party ordinarily may not present an argument on appeal that it failed to raise below." (Citations omitted.) *State v. Wintermeyer*, 158 Ohio St.3d 513, 2019-Ohio-5156, 145 N.E.3d 278, ¶ 10. "It is well established that a party cannot raise new issues or legal theories for the first time on appeal because such issues or theories are deemed waived." (Citations omitted.) *State v. Keating*, 12th Dist. Clermont No. CA2019-08-064, 2020-Ohio-2770, ¶ 27. Even if this argument were not waived, our conclusion would not change if we applied the collective knowledge doctrine to the facts of this case.

**{¶ 45}** According to the State, "[t]hrough the doctrine of collective knowledge, the officers conducting the traffic stop were aware of the facts that were contained in the search warrant." Brief of Appellee at p. 10. The State argues that, based on the totality of those facts, the officers had reasonable suspicion, if not probable cause, to believe that Harrell was involved in drug trafficking in order to justify his detention.

**{¶ 46}** "[C]ourts have recognized the 'collective knowledge doctrine,' which permits police officers to rely on information provided to them by other officers in helping to establish probable cause or reasonable suspicion." *State v. Jones*, 2d Dist. Montgomery No. 23926, 2011-Ohio-1984, ¶ 20. " 'Reasonable suspicion may exist based upon the collective knowledge of the police when there is reliable communication between the officer supplying the information and the officer acting on that information.' " *State v. Mook*, 9th Dist. Wayne No. 97CA0069, 1998 WL 417461, *3 (July 15, 1998), quoting *United States v. Allison*, 616 F.2d 779, 782 (5th Cir.1980).

{¶ 47} "Collective knowledge may be applied horizontally and vertically." *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 31 (2d Dist.), citing *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir.2008). Horizontal application of the collective knowledge doctrine considers situations where several officers have "pieces of the probable cause puzzle," but no single officer possesses sufficient information to satisfy the probable cause standard, and the trial court must determine whether the officers communicated the information they possessed to other officers, thereby pooling their information to meet the probable cause threshold. *Id.* Vertical application of the collective knowledge doctrine, on the other hand, is where one officer has enough information to establish probable cause on his or her own and instructs another officer to act, even though the entire basis for the probable cause is not communicated to the officer who is merely following the directions. *Id.* "Under such circumstances, the State must show that the officer who provided the information had a valid reasonable suspicion of criminal activity or sufficient facts adding up to probable cause." (Citations omitted.) *State v. Hammer*, 2023-Ohio-1307, 213 N.E.3d 238, ¶ 23 (2d Dist.).

{¶ 48} Although the State now relies upon the collective knowledge doctrine to justify the warrantless detention of Harrell, it is dubious whether the evidence adduced at the hearing on the motion to suppress supported the application of the collective knowledge doctrine to the facts of this case. Detective Burch testified that on the day the search warrant was executed, he was working as part of a unit which was being assisted that day by Officer Bowshier. Supp. Tr. 14. He then testified that Officer Bowshier was working with "Officer Hays and a couple other uniform patrols." *Id.* at 15. No other information

was given about Officer Bowshier. Detective Burch stated that Officers Rector and Hays, who were in the same car that day, were assigned to make a traffic stop on Harrell prior to the search warrant's execution. *Id*. at 16. When Harrell was seen leaving the residence, Detective Burch radioed to the "assisting units" to initiate a traffic stop. He did not identify who he had radioed or what he stated over the radio, and it is unclear from his testimony whether the officers who stopped Harrell in fact had received his message.

{¶ 49} Officer Rector testified that she and her partner, Officer Hays, had been assigned to road patrol on the day the search warrant was executed. *Id*. at 18. She testified that they were notified that they were to assist on an investigation with the drug unit. She understood her assignment to be that, when Harrell left the residence, she was to conduct a traffic stop and detain him, which she did. *Id*. at 49. Officer Rector did not identify who contacted her to explain her role that day. Officer Rector did not testify that Detective Burch had directed her to conduct a traffic stop or even that she conducted a traffic stop based on hearing information over the radio. Officer Hays did not testify at the hearing.

{¶ 50} Under these facts, the State failed to identify who communicated the directive to detain Harrell to Officers Rector and Hays. Without such testimony, we cannot determine whether these officers acted upon Detective Burch's communications, and he was the only person identified at the hearing as knowing the contents of the search warrant. While it is possible that Officer Rector was instructed by Detective Burch to detain Harrell, or that she received and reacted to a radio communication to stop Harrell, we cannot eliminate the alternative possibilities that Officers Rector and/or Hays were contacted by

some other law enforcement officer who had no knowledge whatsoever of the basis for the search warrant or that Officer Rector observed Harrell leaving the apartment and performed a traffic stop because that was her assignment pursuant to the standard protocol of the police department to stop individuals who were leaving the location of a search warrant. It was incumbent upon the State to connect the communications between Detective Burch and the detaining officers to demonstrate that an officer who had knowledge of the basis for the reasonable articulable suspicion or probable cause actually transmitted the instruction to another officer, who received and then acted upon this instruction. *United States v. De La Rosa-Calderon*, 511 F.Supp.3d 1202, 1210 (D.Colo.2021). The State failed to present the necessary testimony at the suppression hearing to establish that the collective doctrine applied. *State v. Reno*, 2017-Ohio-4326, 91 N.E.3d 1255, ¶ 16 (2d Dist.) ("At a suppression hearing, the State bears the burden of proof that a warrantless search or seizure was reasonable for Fourth Amendment purposes.").

**{¶ 51}** Nevertheless, even if the collective doctrine had applied, Detective Burch made it clear that Harrell was not being pulled over for investigative purposes or to arrest him. Harrell was pulled over and detained solely for officer safety reasons in conjunction with the execution of the search warrant per standard protocol. Detective Burch testified that Officers Rector and Hays were assigned to make a traffic stop on Harrell before the police entered the residence to conduct the search, because it was standard protocol to isolate the primary target from the residence to provide "more safety for the investigators to enter the residence." Supp. Tr. 15. Detective Burch believed there was "case law" holding that "if you deem a suspect to be a threat of any type * * *, as long as you see that

individual leave whatever residence you have a search warrant for and you stop them in an appropriate amount of time," such as within a mile, "and [brought] him back for the search of that warrant then that is okay." He testified that Harrell was stopped within 1½ to two blocks of the residence. Burch also testified that such stops associated with execution of search warrants were "our common practice of what we do for our safety and our safety only." Supp. Tr. 25-26.

{¶ 52} Officer Rector likewise testified that she was assigned to assist the drug unit in executing a search warrant by conducting a traffic stop on Harrell to detain him once he left the residence. She denied that there was any traffic infraction or any other violation that occurred prior to stopping Harrell; the detention was solely based on the fact that other officers were executing a search warrant. When the officers removed Harrell from his vehicle, they informed him that he was being detained in reference to a search warrant. Officer Rector did not testify that the stop was made to investigate potential ongoing or past criminal behavior or to conduct an arrest. She also did not identify any movement or action by Harrell that created a suspicion that he may have been armed or fleeing the location of the search warrant with the evidence sought.

{¶ 53} The justification originally given by the State and the testimony provided by law enforcement officers at the suppression hearing put the traffic stop squarely within the category of detentions expressly prohibited by *Bailey*. "As with any traditional investigative stop, a traffic stop based on collective knowledge must be supported by a proper basis and must remain reasonably related in its scope to the situation at hand." *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir.2012). Given that no Fourth Amendment exception

permitted Harrell's stop, we conclude it was unconstitutional.

**{¶ 54}** "Evidence is inadmissible if it stems from an unconstitutional search or seizure." *Reno*, 2017-Ohio-4326, 91 N.E.3d 1255, at ¶ 15, citing *Wong Sun v. United States*, 371 U.S. 471, 484-85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "While the text of the Fourth Amendment says nothing about suppressing evidence obtained in violation of the rights enunciated therein, the United States Supreme Court has created an 'exclusionary rule'—'a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation.' " *State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, 150 N.E.3d 912, ¶ 14, quoting *Davis v. United States*, 564 U.S. 229, 231-232, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). In determining whether the sanction for the Fourth Amendment violation should be to exclude the evidence, we must consider whether exclusion will remedy the wrong and deter future wrongdoing. *State v. Bembry*, 151 Ohio St.3d 502, 2017-Ohio-8114, 90 N.E.3d 891, ¶ 18.

**{¶ 55}** Considering the sequence of events and the justifications offered by the Springfield Police Department and the State that the officers' actions constituted standard protocol, we conclude that exclusion of the evidence is warranted to remedy the wrong and deter any future wrongdoing. The United States Supreme Court decided *Bailey* several years before the actions in this case occurred, yet the Springfield Police Department had not corrected its standard protocol to comply with Fourth Amendment law. Moreover, based on Detective Burch's statements at the suppression hearing, it appears he was referring to *Bailey* in support of his actions, thus indicating his familiarity with, albeit incorrect understanding of, the case. We cannot conclude that this was objectively

reasonable conduct. Accordingly, evidence obtained from Harrell's unlawful seizure must be suppressed, including the cell phone that was confiscated from him and its contents, which were later used extensively at trial.

{¶ 56} Because the use of the contents of the cell phone permeated the entire trial, we will reverse all of Harrell's convictions and remand for further proceedings. The State relied heavily on the contents of Harrell's cell phone to support Count One of the indictment, engaging in a pattern of corrupt activity. Although Counts Two through Five did not directly rely on the contents of Harrell's cell phone, the contents were used to support the veracity of Yeager, whose testimony was essential for the jury to convict Harrell on those counts. We note that the State's bill of particulars provided that, in relation to Counts Two through Five, the State intended to rely on the contents of Harrell's cell phone, which "revealed multiple conversations and photos to confirm that he [was] selling narcotics." Bill of Particulars (August 13, 2021). Likewise, in closing argument, the State argued that the jury should consider the text messages and extraction report from Harrell's cell phone to find him guilty of the offenses related to the undercover drug buys. Trial Tr. 703.

{¶ 57} Harrell's first assignment of error is sustained in part, concerning the trial court's denial of his motion to suppress evidence obtained during his unlawful detention.

### b. Motion to Suppress Identification Evidence

{¶ 58} While our resolution of the first assignment of error renders moot many of Harrell's remaining arguments, we will address those arguments not rendered moot. App.R. 12(A)(1)(c). "[A]n assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court."

*State v. Gideon*, 165 Ohio St.3d 156, 2020-Ohio-6961, 176 N.E.3d 720, ¶ 26.  Because our review of the trial court's ruling on suppression of a pretrial identification could have a legal effect upon the admissibility of Yeager's out-of-court identification upon retrial, we will consider the trial court's ruling on Harrell's motion to suppress identification testimony.

{¶ 59} Following the hearing on Harrell's initial motion to suppress, on May 2, 2022, Harrell filed a supplemental motion to suppress challenging the pretrial identification procedure.  Specifically, Harrell claimed that because Detective Burch used a single photo for identification purposes rather than a photo lineup as set forth in R.C. 2933.83, the pretrial identification procedure was impermissibly suggestive and violated his due process rights.  Harrell claimed in his motion that he had been unaware of the exact procedures used to identify Harrell by the CI, i.e., using a single photo, until Detective Burch testified at the April 21, 2022 motion to suppress hearing.  Harrell also requested a hearing on the supplemental motion.

{¶ 60} The trial court overruled Harrell's second motion to suppress without a hearing, finding that it was untimely pursuant to Crim.R. 12(D) and that it was not in the interest of justice to extend the time for making pretrial motions.  When ruling on Harrell's motion, the trial court balanced Harrell's interests against the timeliness of the supplemental motion, trial delays, disclosure of the CI, and the applicability of R.C. 2933.83.  Finding that Harrell's interests were outweighed by the other competing interests and that Harrell's rights would not be eradicated but merely delayed until trial, the trial court overruled Harrell's supplemental motion in its entirety.  Under the facts of this case, we cannot conclude that the trial court's decision was an abuse of discretion.

{¶ 61} A motion to suppress pretrial identification testimony on the grounds it was illegally obtained must be raised prior to trial. Crim.R. 12(C)(3). The time frame governing pretrial motions is set forth in Crim.R. 12(D), which states in relevant part:

> All pretrial motions * * * shall be made within thirty-five days after
>
> arraignment or seven days before trial, whichever is earlier. The court in
>
> the interest of justice may extend the time for making pretrial motions.

{¶ 62} A defendant's failure to timely file a motion to suppress constitutes a waiver of that issue, "but the court for good cause shown may grant relief from the waiver." Crim.R. 12(H). A trial court's decision whether to grant leave to file an untimely motion to suppress is within its sound discretion, and we will not reverse a trial court's decision regarding an untimely motion absent an abuse of discretion. *State v. Garrett*, 2d Dist. Greene No. 2004-CA-110, 2005-Ohio-4832, ¶ 14, citing *Akron v. Milewski*, 21 Ohio App.3d 140, 142, 487 N.E.2d 582 (9th Dist.1985). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 63} The trial court first considered the timeliness of Harrell's supplemental motion and determined it was unreasonably untimely. As previously noted, a pretrial motion

should be filed within 35 days after arraignment or 7 days before trial, whichever is earlier. Crim.R. 12(D). Harrell was arraigned on July 9, 2021. By the time the May 2, 2022 supplemental motion to suppress was filed, far more than 35 days had passed since Harrell was arraigned and at least three trial dates had been scheduled and cancelled due to actions by the defense. Accordingly, the trial court reasonably concluded that granting a hearing on the motion would inevitably delay the case even further.

{¶ 64} The trial court also rejected Harrell's claim that he could not have addressed the issue earlier. Defense counsel could have inquired about the details of the identification from the prosecutor in a timely fashion. Nevertheless, the trial court concluded that defense counsel would have the right to question the validity of the identification procedure with great latitude at trial, which he did.

{¶ 65} The trial court also considered that allowing a supplemental hearing might have required disclosure of the CI. The trial court had previously held that the CI was not required to be disclosed by the State until the start of trial. Granting a hearing at which the CI's identity would have to be disclosed would have allowed Harrell to circumvent the trial court's prior orders. The trial court further observed that Harrell's supplemental motion admitted it was "in essence, a glorified request for discovery," rather than seriously challenging the identification procedure.

{¶ 66} Finally, the trial court considered the applicability of R.C. 2933.83 to the facts of this case and concluded that it was not applicable and, further, that there had been little to no risk of unfair identification and/or misidentification due to the CI's prior relationship with Harrell.

{¶ 67} The record demonstrates that Harrell's motion was untimely, and the trial court's conclusion that it was not in the interest of justice to extend the time limit was not an abuse of discretion. As the trial court noted, the case had been rescheduled for trial three times, all attributable to Harrell's requests, prior to the filing of Harrell's supplemental motion. Harrell had previously been permitted to file an untimely motion to suppress and had been granted a hearing on it. Moreover, the identification issue had been discussed during the April 21, 2022 hearing, such that defense counsel had had the opportunity to question the detective more about the identification procedures at that time.

{¶ 68} Finally, we agree with the trial court that R.C. 2933.83 did not apply to the facts in this case. R.C. 2933.83 provides for certain minimum requirements to be followed when conducting "live lineups or photo lineups." R.C. 2933.83(B). The statute does not set forth requirements to be followed where only one photo is shown.

{¶ 69} "Courts have held that where only one photo is shown, R.C. 2933.83 does not apply." (Citations omitted.) *State v. McShann*, 2d Dist. Montgomery No. 27803, 2019-Ohio-4481, ¶ 70. "In that situation, the issue is whether a defendant's due process rights were violated due to the procedure used for identification." *Id.*, citing *State v. Lennon*, 8th Dist. Cuyahoga No. 104344, 2017-Ohio-2753, ¶ 54. " 'When a witness has been confronted with a suspect before trial, due process requires a court to suppress [his or her] identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under all the circumstances.' " (Emphasis sic.) *State v. Murphy*, 91 Ohio St.3d 516, 534, 747 N.E.2d 765 (2001), quoting *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992). Reliability of the pretrial

identification is the "linchpin" in determining the admissibility of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002), quoting *State v. White*, 2d Dist. Clark No. 3057, 1994 WL 43095, *2 (Feb. 2, 1994).

{¶ 70} There was no photo lineup conducted in this case. Rather, a single photo was provided to the CI, who verified that the photograph was the individual she knew as "Cuz." The fact that the detective did not use the procedures set forth in R.C. 2933.83 does not establish that the pretrial identification procedure violated Harrell's due process rights considering the reliability of the identification. Detective Burch testified that the CI was familiar with Harrell, although the CI only knew Harrell by his street name and not his legal name. The CI also provided the detective with information about Harrell's age, scars, tattoos, his cell phone number, and his address, all before confirming the photograph was in fact a picture of "Cuz." Detective Burch knew that the CI had been with Harrell on multiple occasions prior to the identification. Thus, this was not a situation where the witness was unfamiliar with the suspect such that a single photograph could potentially lead to misidentification. Considering this evidence, the trial court reasonably found that there was little to no danger of misidentification and that the identification was sufficiently reliable. We conclude that the trial court did not abuse its discretion in overruling Harrell's untimely motion. We therefore overrule Harrell's first assignment of error in part, relating to the denial of his second motion to suppress.

### III. Remaining Arguments and Assignments of Error

{¶ 71} The following remaining arguments in Harrell's first assignment of error are rendered moot, and are therefore overruled, by virtue of the fact that we will reverse his convictions: the trial court's alleged error in denying his motions associated with the CI, the evidence allegedly improperly admitted at trial, the denial of Harrell's motion for a mistrial, and the alleged inadequate jury instructions and responses to the jury's questions. Likewise, Harrell's fourth assignment of error alleging cumulative error is also rendered moot by our resolution of the first assignment of error and is therefore overruled. App.R. 12(A)(1)(c). However, Harrell's argument in his first assignment of error concerning the trial court's alleged error in overruling his Crim.R. 29 motion for acquittal and his second and third assignments of error challenging the sufficiency of the evidence are not moot.

{¶ 72} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. "An assignment of error going to the sufficiency of the evidence supporting a criminal count is always potentially dispositive of that count. While a reversal based on weight of the evidence does not preclude a retrial, a reversal based on insufficient evidence leads to an acquittal that bars a retrial." *Gideon*, 165 Ohio St.3d 156, 2020-Ohio-6961, 176 N.E.3d 720, at ¶ 27. "When a conviction is based on evidence that does not establish a defendant's guilt beyond a reasonable doubt, the court of appeals must vacate the conviction and double-jeopardy protection bars the defendant's retrial for the same offense. An assignment of error raising the sufficiency of the evidence is thus potentially dispositive of a particular count and cannot be moot." *Id.* at ¶ 29.

{¶ 73} Accordingly, it is appropriate for us to consider Harrell's argument in his first assignment of error concerning the denial of his Crim.R. 29 motion for acquittal, as well as the sufficiency arguments raised in his second and third assignments of error. In doing so, we will consider all of the evidence admitted at trial, including the evidence involving the contents of his cell phone, which we have determined should have been suppressed. *Id.* We need not, however, consider any manifest weight of the evidence arguments, as a reversal based on the weight of the evidence would not prevent the State from retrying Harrell.

{¶ 74} We are cognizant that an appellate court's review of a trial court's denial of a Crim.R. 29 motion for acquittal at the end of the State's case is limited to the evidence then available to the trial court. *State v. Bailey*, 2d Dist. Montgomery No. 27177, 2017-Ohio-2679, ¶ 17, citing *State v. Sheppeard*, 2d Dist. Clark No. 2012-CA-27, 2013-Ohio-812, ¶ 51. In this case, however, no additional evidence was submitted by either party after the trial court overruled Harrell's Crim.R. 29 motion. Accordingly, our reviews of the sufficiency of the evidence supporting the convictions and of the trial court's denial of Harrell's Crim.R. 29 motion involve exactly the same evidence and will be considered together.

### a. Standards of Review

{¶ 75} "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, 170 N.E.3d 813, ¶ 7, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When

considering the legal sufficiency of the evidence, appellate courts do not engage in a determination of witness credibility. *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). Rather, the relevant inquiry is whether the evidence presented, if believed, is sufficient to support the conviction. *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring). "The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo." *State v. Campbell*, 2d Dist. Montgomery No. 26575, 2016-Ohio-598, ¶ 6, citing *Thompkins* at 386.

### b. Evidence Submitted at Trial

{¶ 76} The State presented the testimony of Jessica Kaiser, a forensic scientist for the Ohio Bureau of Criminal Investigation. Kaiser testified that she analyzed two exhibits that were suspected controlled substances provided to her agency by the Springfield Police Department. State's Exhibit 3 was determined to be 20.78 grams plus or minus 0.04 grams of methamphetamine. State's Exhibit 4 was determined to be 8.09 grams plus or minus 0.04 grams of methamphetamine. Kaiser further testified that methamphetamine is a Schedule II controlled substance and that the bulk amount of methamphetamine is 3 grams.

{¶ 77} Amber Yeager testified that in June 2020, she was stopped at a Walmart for trying to steal something. Officers located over 20 grams of methamphetamine on her person, and she was arrested. Due to those circumstances, she entered into an agreement to work as a CI for the Springfield Police Department in exchange for potentially not being charged with a second-degree felony offense of trafficking in drugs and a third-

degree felony offense of possession of drugs. Yeager had two prior convictions for theft offenses in Ohio that she described as mistakes. She was also on parole out of Texas for possession of marijuana that had occurred 10 years prior and was facing up to 10 years in prison for a parole violation.

**{¶ 78}** Yeager provided police with information about an individual she knew as "Cuz," whom she later identified as Harrell. Yeager testified that she first met Harrell through Barclay a few years prior to becoming a CI. At that time, Yeager was a drug user and Barclay sold her methamphetamine. Harrell identified himself to her as Barclay's supplier of methamphetamine. Over time, she developed a relationship with Harrell, including living in his apartment on Ludlow at times and having a romantic relationship with him.

**{¶ 79}** In July 2020, Yeager was living in a house on Dayton Avenue in Springfield, Ohio. Harrell stopped in unannounced on July 7, 2020, and gave her approximately 20 grams of methamphetamine. He told her to bring him $500 for the drugs. Based on their relationship, Yeager understood the transaction to mean that he wanted the money after she sold the drugs. But because she was working as a CI at the time, Yeager put the drugs in her kitchen cabinet and contacted Detective Burch about what had happened instead of selling any of the methamphetamine. She was directed to hold onto the methamphetamine until the detectives could get it from her. She did not open the package, tamper with, or use any of the drugs that Harrell provided.

**{¶ 80}** The detectives retrieved the drugs from Yeager on July 9, 2020. The following day, the detectives gave her $500 to give to Harrell for the drugs. She was also

given recording devices and searched before going to 351½ Ludlow Avenue, where she met Harrell to give him the money. Yeager was instructed to ask Harrell for additional drugs after turning over the $500, which she did. Yeager fabricated a story to explain the amount of time that had passed between when Harrell gave Yeager the drugs and when she turned over the $500 to Harrell. Her story was used to explain why she "didn't have the money on time" and why she had not answered Harrell's phone calls. Trial Tr. 299. This transaction involving about 20 grams of methamphetamine and $500 was referred to as the "first buy."

{¶ 81} After receiving the $500, Harrell gave Yeager approximately 8 grams of methamphetamine and expected her to pay him $100 for the drugs. He indicated that, after she paid him $100 for the 8 grams of methamphetamine, then she would be "paid off," meaning that she would no longer owe Harrell anything for either the 20 grams or the 8 grams of methamphetamine he had given her. She told Harrell that she already had someone ready to buy the 8 grams from her, and he said to "get rid of it" and bring the money right back. After getting the additional drugs, she met again with the detectives, who provided her with the $100 Harrell had requested for the drugs. She then went back to Harrell's apartment that same day and gave him the money. When she left, she met with the detectives and they searched her again. This transaction involving about 8 grams of methamphetamine in exchange for $100 was referred to as the "second buy."

{¶ 82} Detective Justin Allender testified that he became a police officer in February 2011, began working for the Springfield Police Department in June 2016, and became a detective in the narcotics unit in May 2019. In July 2020, Detective Allender's unit was

notified by Yeager that she had been fronted approximately an ounce of methamphetamine. Although they were unable to meet with Yeager right away, they did meet with her on July 9, 2020, and collected the drugs from her. The methamphetamine collected on July 9, 2020, was identified as State's Exhibit 3.

**{¶ 83}** Detective Allender explained it was not uncommon for drug dealers to provide drugs with the intent of getting paid back at a later time. Although the narcotics unit typically did not pay drug debts, it decided to pay the debt owed from the drugs fronted to Yeager in order to request more drugs from Harrell. In this case, the debt was $500; officers photocopied the money and then provided the cash to Yeager to give to Harrell. Detective Allender testified that Yeager was searched before and after the buys. The officers also watched the transactions in real time through the electronic monitoring devices that Yeager was given.

**{¶ 84}** Detective Allender testified that after being briefed about what to do, Yeager went to 351½ Ludlow Avenue and met with Harrell. Based on watching the event in real time, Allender observed that Yeager provided Harrell with the $500, Harrell fronted Yeager a bag of approximately eight grams of methamphetamine, and then Yeager returned directly to the detectives. Yeager turned over the methamphetamine, which was identified at trial as State's Exhibit Four. The detectives provided an additional $100 in cash to Yeager, which had also been photocopied, to pay Harrell for the eight grams of methamphetamine. Yeager returned later that day to 351½ Ludlow Avenue and gave Harrell the $100 for the second buy. She then met with detectives again to turn over the recording devices, and she was searched again. According to Detective Allender, a dose

of methamphetamine was about a tenth of a gram.

{¶ 85} Detective Burch was the assigned case detective for this investigation. Burch testified that he had worked for the Springfield Police Department since 2015 and had been in the Narcotics Bureau since 2019. Prior to that he was an infantryman in the United States Marine Corps for several years. Detective Burch testified he had had cell phone investigative training, mid-level narcotics training, and financial investigation training. Furthermore, his training included a Mexican Cartel course, which provided information as to how drug organizations usually structure themselves. According to Burch, usually there is one individual in an organization who has a connection to a source or supply; other individuals underneath that supplier may not have the same connections or know the source but will go to the individual who has a connection to the supplier to obtain product.

{¶ 86} Detective Burch testified that he first became aware of Jeremy Barclay during a traffic stop in 2017 or 2018 at which drugs, drug paraphernalia, and body armor were confiscated. Barclay's name came up later during additional drug investigations. and it appeared Barclay was buying and selling methamphetamines. While investigating Barclay and other individuals, Burch came across a confidential source, Amber Yeager, who provided information about Barclay and who also provided information about Harrell, whom she identified as Barclay's drug source.

{¶ 87} Detective Burch testified that Yeager became involved in the case because she was caught with about an ounce of methamphetamine. She agreed to work as a CI with the Springfield Police Department and was able to provide information regarding Harrell and other individuals involved in the drug trade. Yeager supplied information to the

police about someone known to her as "Cuz," who was selling methamphetamine. She provided a phone number for Harrell, a Facebook name of "DonJuan Sheppard," and identified Harrell's address in Springfield and another address in Dayton, Ohio. According to Detective Burch, Yeager also worked for Harrell at different locations for his real estate renovation business.

{¶ 88} Based on the information provided by Yeager, Detective Burch began to surveille Harrell's duplex, obtained subpoenas for Harrell's cell phone records, and looked into the Facebook records of "DonJuan Sheppard." During surveillance of 351½ Ludlow Avenue, Burch observed people coming and going from that location. When Burch looked up the owner of the Dayton address, he learned that Othello DonJuan Harrell owned the home. On July 9, 2020, Detective Burch texted a driver's license photo of Harrell to Yeager asking, "Is this Cuz?" She then verified that it was the person she knew as "Cuz."

{¶ 89} Around July 7, 2020, Yeager informed Detective Burch that Harrell was at her house talking about selling narcotics and had provided Yeager with an ounce of methamphetamine, which she put into her kitchen cabinet. Because Detective Burch was on vacation, he was unable to do anything until he returned, at which point the two drug buys were arranged as previously discussed.

{¶ 90} Following the two drug buys, Detective Burch obtained search warrants for Harrell's apartment and Jeremy Barclay's apartment. Prior to executing the search warrant on Harrell's residence, Harrell was seen leaving the apartment, and uniformed officers conducted a traffic stop on Harrell. Harrell was then brought back near the apartment, where he consented to a search of his vehicle. Inside Harrell's vehicle, officers

located some marijuana in a small plastic bag, and a white iPhone and about $3,400 in cash was found on his person. During the search of the apartment, officers located seven bullets inside a sock, a digital scale with white powder residue, and plastic bags that contained residue believed to be from methamphetamine.

{¶ 91} Later in the investigation, Detective Burch obtained a search warrant for Harrell's iPhone, which had not been covered under the residential search warrant. The phone was subsequently submitted to the Ohio Narcotic Intelligence Center ("ONIC") to unlock the phone and extract the data from it. After the information was extracted, Detective Burch requested that an analyst at ONIC go through the phone and create a report that could identify drug terms used on the phone, individuals identified from cell phone numbers, and various accounts associated with the cell phone, such as iCloud and Gmail accounts.

{¶ 92} Springfield Police Officer Jason Byron of the evidence room and the crime scene unit testified about the chain of custody of the property collected in the case.

{¶ 93} Richard Steller, a forensic supervisor for ONIC, was certified in cellphone and computer forensics. Steller testified about his analysis of Harrell's iPhone. He "dumped" all the data from the cell phone and converted it into a readable format known as the Cellebrite Reader report. A copy of that report was provided to the Springfield Police Department and another copy was provided to the Intelligence Section of ONIC for further analysis.

{¶ 94} Kara Robb of ONIC conducted the analysis of Harrell's iPhone using Steller's Cellebrite report and law enforcement databases. Through her analysis, Robb was able

to verify that the iPhone belonged to Harrell based on images, messages, social media accounts, and the phone number associated with the device. Using information obtained through the Cellebrite report, Robb created a glossary of terms derived directly from the messages in the phone. The meanings attributed to the words were based on the context of the messages, Robb's training and experience, DEA sources, and other cases at ONIC.

{¶ 95} Robb created a list of important contacts and numbers found in Harrell's phone. This included potential suppliers and "Germ," who was considered a potential resale dealer. "Germ" was identified as Jeremy Barclay. Robb also located several Facebook and text message conversations from June, July, and August 2020 between Harrell and various customers, including Barclay, discussing prices and amounts of drugs.

{¶ 96} Robb also created a case portfolio based on records from the Springfield Police Department and Harrell's phone contents. The case portfolio included information from multiple defendants in this case and showed a diagram of the potential flow of methamphetamine. At the top of the chart was Harrell, with potential sales flowing from him to Barclay and Regan Foster. Robb identified that Barclay, Foster, and Yeager were the top three contacts on Harrell's phone. She also testified to contacts on Barclay's phone and stated that Barclay had multiple drug-related contacts with others, some of whom were also co-defendants in this case.

{¶ 97} Jayson Blair, one of Harrell's co-defendants, testified for the State. Blair testified that he met Harrell through Regan Foster, who was another co-defendant. Between November 2019, when Blair and Foster first met, and August 2020, when they were arrested, Blair became familiar with Harrell, whom he knew as "Cuz." The first time

Blair met Harrell, Foster picked Blair up, and Blair told Foster that he had a "play" for a quarter pound of methamphetamine. Foster then called Harrell and they picked him up on Ludlow and drove to Logan County to sell methamphetamine. Because Foster had recently had items stolen from her and Harrell was not familiar with Blair, Harrell accompanied them to Logan County to conduct the transaction. Afterward, Harrell let Foster keep the profit from the sale since she needed money to get back on her feet. The proceeds were counted and dispersed at Harrell's Ludlow apartment.

{¶ 98} Blair and Foster had been involved in a romantic relationship, and they both used methamphetamines. Blair stated that when someone first starts using methamphetamine, they would start with a tenth of a gram but then progress from there. Blair personally observed Harrell sell methamphetamines to Foster, and there were two or three times that Harrell sold Foster fentanyl. Although Blair did not communicate with Harrell on his own phone, he spoke to Harrell on Foster's phone and had been to Harrell's apartment on Ludlow. Foster would resell some of the drugs Harrell provided her and she would also use some of the drugs. Although Harrell did not sell drugs directly to Blair, Blair and Foster would pool their money to get drugs from Harrell, and Foster would then purchase it. Blair and Foster sold more drugs than they used in order to make money to maintain their lifestyle. Foster kept a notebook to keep records of who she sold to and what she sold them.

{¶ 99} Blair also pooled money with other people so that they could purchase larger amounts of drugs at a cheaper price. Jeffrey Palmer, another co-defendant in the case, was the first to go in with them to buy drugs. Blair recalled a time when "almost all the co-

defendants were going in together" to purchase methamphetamine. If some people were unable to get drugs through their suppliers, but others in the group could, they would work together to obtain the drugs. The amount that they would pool together to purchase methamphetamine varied, but there was one time that they pooled together $7,000 to buy drugs in Dayton. The amount of methamphetamine they would purchase from Harrell generally ranged from a "ball," about 3.5 grams, up to a quarter pound.

{¶ 100} Blair was aware that Harrell supplied methamphetamine to Barclay. Barclay then sold the drugs to other co-defendants, including Josh Thompson, Blair, and Foster. Harrell never bought drugs from any of them, rather, they would go to Harrell to obtain drugs.

{¶ 101} Blair testified that, in his experience, high-level drug dealers tended to keep their circles small. After he was arrested in August 2020, Harrell no longer wanted to sell to Blair and Foster because they were "too hot to mess with," meaning they were on the police's radar, so Blair bought drugs from a different drug dealer. This resulted in some of the additional drug charges against him in the indictment that were unrelated to Harrell. In exchange for his testimony against Harrell, Blair agreed to receive a total prison term of five to six-and-a-half years in prison on two counts of the original 26 counts for which he was indicted.

{¶ 102} Barclay, another co-defendant, testified for the State. Although not clear from the record, it appears that Barclay entered into a plea agreement with the State to dismiss the charge of engaging in a pattern of corrupt activity against him in exchange for his testimony against Harrell. At the time of his testimony, he was serving a lengthy prison

sentence on other cases.

{¶ 103} Barclay met Harrell in 2018 through a mutual friend while waiting to buy 28 grams of methamphetamine from Harrell, whom he knew as "Cuz."   When he first started buying drugs from Harrell, they would meet up in Dayton because Harrell lived in Dayton. Over time, Barclay purchased more methamphetamine from Harrell, the largest amount being one pound of methamphetamine in a single purchase.   In 2018, Barclay usually saw Harrell a couple of times per day.   He would buy a pound of methamphetamine from Harrell every other day or every couple of days.   Barclay continued to purchase drugs from Harrell until he was arrested in 2020.

{¶ 104} Although the transactions originally occurred in Dayton, at some point in time, Harrell began providing drugs to Barclay in Clark County.   When Barclay lived on Bell Street in Clark County, Harrell brought him methamphetamine every day or every other day.   At that time, Harrell brought him roughly ten pounds of methamphetamine a week. Rarely did Barclay obtain other drugs from Harrell, although he did obtain crack cocaine on occasion.   Barclay mainly sold to drug users but also sold to other drug traffickers. Although Barclay was able to get drugs from other suppliers, Harrell was his largest supplier.   Any time Barclay needed methamphetamine, Harrell had it, so long as he was "working" (meaning selling drugs).   There were times that Harrell was not "working" and Barclay would have to get drugs from other suppliers instead.

{¶ 105} At some point, Barclay moved into an apartment on Ludlow that he believed was owned by Harrell.  Although he could not recall the specific address, he identified it as a duplex; the duplex had four apartments, and Barclay lived in the bottom right

apartment. Harrell sometimes stayed in the apartment above Barclay, but Barclay knew Harrell to live somewhere else. The apartment in which Barclay lived was not connected to Harrell's apartment, but Barclay had a key to Harrell's apartment and would go in there when instructed by Harrell to grab something, fix something, or clean it.

{¶ 106} Barclay admitted that he sold methamphetamine to co-defendants Joshua Thompson, Jeffrey Palmer, Regan Foster, and Jayson Blair, along with other unnamed individuals. Sometimes that methamphetamine was sourced from Harrell but was sold via Barclay. At no time did Barclay ever sell drugs to Harrell, and Harrell was not known to use methamphetamine.

{¶ 107} Barclay communicated with Harrell via telephone, text messages, and sometimes Facebook Messenger. Harrell usually required Barclay to pay for drugs upfront, but there had been rare occasions when Harrell fronted Barclay drugs. Barclay was unaware of anyone else to whom Harrell would front drugs. Harrell did not direct him to sell drugs to individuals; it was Barclay's decision to sell drugs.

### c. Sufficient Evidence

{¶ 108} In challenging his conviction for engaging in a pattern of corrupt activity under his third assignment of error, Harrell contends that his conviction was not supported by sufficient evidence, because the State failed to prove (1) the existence of an enterprise and Harrell's association with the enterprise, and (2) that the value of the contraband exceeded one thousand dollars for each incident of corrupt activity, as is required by the statute. In Harrell's second assignment of error, he contends that there was insufficient evidence presented for a reasonable jury to find that he had committed aggravated

trafficking in drugs and aggravated possession of drugs, because there was no audio or video recording showing him handing over any drugs to Yeager on July 7, 2020. Harrell does not separately challenge his convictions for the third-degree felony offenses, but because he made a generic Crim.R. 29, the denial of which he challenges on appeal, we will also consider the sufficiency of the evidence for those offenses.

{¶ 109} Harrell was convicted in Count One of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1). The State alleged that, as a continuing course of conduct from about September 9, 2019 to about June 28, 2021, while employed by or associated with any enterprise, Harrell conducted or participated in, either directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt. Furthermore, the jury further found that the offense was elevated to a felony of the first degree because at least one of the incidents of corrupt activity was a felony of the first, second, or third degree. R.C. 2323.32(B)(1).

{¶ 110} An "enterprise" is defined as including "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). An "enterprise" can include licit or illicit enterprises. *Id.*

{¶ 111} "Corrupt activity," in this case, is defined as "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in" conduct constituting any violation of R.C. 2925.03,

> when the proceeds of the violation, * * * or the value of the contraband or

other property illegally possessed, sold, or purchased in the violation exceeds one thousand dollars, or any combination of violations described in division (I)(2)(c) of this section when the total proceeds of the combination of violations, * * * or value of the contraband or other property illegally possessed, sold, or purchased in the combination of violations exceeds one thousand dollars[.]

R.C. 2923.31(I)(2)(c).  R.C. 2925.03 consists of two ways to traffic drugs that are relevant to the circumstances of this case.  First, a violation of the statute could be committed by selling or offering to sell a controlled substance.  R.C. 2925.03(A)(1).  Second, a violation of the statute could be accomplished by preparing for shipment, shipping, transporting, delivering, preparing for distribution, or distributing a controlled substance, when the offender knew or had reasonable cause to believe that the controlled substance was intended for sale or resale by the offender or another person.  R.C. 2925.03(A)(2).

**{¶ 112}** A "pattern of corrupt activity" means "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."  R.C. 2923.31(E). Furthermore, "at least one of the incidents forming the pattern shall constitute a felony under the laws of this state in existence at the time it was committed[.]"  *Id.*

**{¶ 113}** Violations of R.C. 2923.32(A) are sometimes referred to as "RICO" offenses, because the statute is Ohio's version of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961 et seq.  *State v. Beverly*, 143 Ohio St.3d 258,

2015-Ohio-219, 37 N.E.3d 116, ¶ 3. "A RICO offense is dependent upon a defendant committing two or more predicate offenses listed in R.C. 2923.31(I)." *State v. Miranda*, 138 Ohio St.3d 184, 2014-Ohio-451, 5 N.E.3d 603, ¶ 13.

{¶ 114} Harrell was convicted in Counts Two and Four of aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(2). Under R.C. 2925.03(A)(2), the State was required to prove that Harrell did knowingly prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a Schedule II controlled substance, in this case, methamphetamine, when he knew or had reasonable cause to believe that the controlled substance was intended for sale or resale by himself or another person. The State further alleged that the amount of methamphetamine involved in Count Two was in an amount equal to or greater than five times the bulk amount but less than fifty times the bulk amount and that the amount of methamphetamine involved in Count Four was in an amount equal to or greater than the bulk amount but less than five times the bulk amount.

{¶ 115} In Counts Three and Five, Harrell was convicted of aggravated possession of drugs, in violation of R.C. 2925.11(A). For those charges, the State was required to prove that Harrell had knowingly possessed a Schedule II controlled substance, in this case, methamphetamine. The State alleged that Harrell knowingly possessed methamphetamine in Count Three in an amount equal to or greater than five times the bulk amount but less than fifty times the bulk amount, and that the amount of methamphetamine involved in Count Four was in an amount equal to or greater than the bulk amount but less than five times the bulk amount.

{¶ 116} The State alleged that Counts Two and Three were based on events that

occurred between July 7 and 10, 2020, in which Harrell provided 20.78 grams of methamphetamine to Yeager.[1]  Counts Four and Five were based on events that occurred on or about July 10, 2020, in which Harrell provided 8.09 grams of methamphetamine to Yeager.  The RICO charge, on the other hand, was based on all events discussed at trial involving Harrell between September 9, 2019, and June 28, 2021, including Yeager's two buys in July 2020.

**{¶ 117}** The evidence presented at trial for each of the two drug buys that involved Yeager, if believed, was sufficient to sustain Harrell's convictions for the two counts of aggravated trafficking in drugs and the two counts of aggravated possession of drugs. Yeager testified that, for the first buy, she was fronted about 20 grams of methamphetamine from Harrell personally at her house in Clark County, Ohio, on July 7, 2020.  The drugs were later tested and determined to be 20.78 grams plus or minus 0.04 grams of methamphetamine.  Kaiser testified that methamphetamine was a Schedule II controlled substance and that the bulk amount of methamphetamine was 3 grams.  Accordingly, the evidence demonstrated that Harrell had been in possession of methamphetamine in an amount equal to or greater than five times the bulk amount but less than fifty times the amount.  Yeager also testified that for the first drug buy, Harrell expected her to resell the drugs and return $500 to him after she sold them.  This was corroborated when she brought Harrell $500 on July 10, 2020, while working undercover.  Thus, Harrell knowingly transported and/or delivered methamphetamine to Yeager when he knew or had

---

[1] Harrell challenges on appeal the trial court's granting the State's motion to amend the dates in the indictment.  However, because we are considering the sufficiency of the evidence as it was presented at trial to determine whether the State may retry Harrell, we will conduct our analysis based on the amendment of the indictment.

reasonable cause to believe that the controlled substance was intended for resale. The evidence from this first buy was sufficient to support a conviction for Count Two, aggravated trafficking in drugs, and Count Three, aggravated possession of drugs.

{¶ 118} When Yeager returned to Harrell's Clark County apartment on July 10, 2020, to pay him the $500 from the first buy transaction, she asked for an additional 8 grams of methamphetamine. When Yeager told Harrell that she already had a buyer for the 8 grams of methamphetamine, he said to "get rid of it" and bring the money right back. Yeager testified that Harrell handed her about eight grams of methamphetamine, which she subsequently turned over to law enforcement. Kaiser testified that these drugs were determined to be 8.09 grams plus or minus 0.04 grams of methamphetamine. The evidence from this second buy was sufficient to support Harrell's convictions for Count Four, aggravated trafficking in drugs, and Count Five, aggravated possession of drugs.

{¶ 119} As for the RICO charge in Count One of the indictment, viewing the evidence in the light most favorable to the prosecution, as we must, a rational juror could have reasonably concluded that Harrell was engaged in an illicit enterprise to engage in trafficking in drugs for profit.

{¶ 120} In this case, the alleged enterprise was clearly not a legal entity, but rather an "association-in-fact." In considering the federal RICO statute, which is materially similar to Ohio's RICO statute, the United States Supreme Court has concluded that "an association-in-fact enterprise need not have a formal structure, but must have at least the following features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.' "

*State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, ¶ 19, quoting *Boyle v. United States*, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

**{¶ 121}** Harrell argues that there was no enterprise or "association-in-fact" because he was a "lone shark" drug dealer who sold drugs to other independent drug dealers. However, "[t]he definition of 'enterprise' is remarkably open-ended." *Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, 37 N.E.3d 116, at ¶ 8. The Ohio Supreme Court has stated that "the existence of an enterprise, sufficient to sustain a conviction for engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1), can be established without proving that the enterprise is a structure separate and distinct from a pattern of corrupt activity." *Id.* at syllabus. Notably, the same evidence can be used to prove both the existence of an enterprise and the associated pattern of corrupt activity. *Id.* at ¶ 7.

**{¶ 122}** The evidence at trial established that Harrell was an upper-level drug supplier responsible for supplying lower-level drug dealers and users in Springfield with methamphetamine, but he was not a user himself and he did not buy methamphetamine from any of the people to whom he sold drugs. Harrell sold large quantities of methamphetamines to Barclay, Yeager, and Foster, knowing or having reasonable cause to believe that they would resell the drugs. Harrell's relationships and ongoing conduct with each of them sufficiently demonstrated an illicit enterprise of drug trafficking for profit.

**{¶ 123}** Yeager met Harrell through Barclay, from whom she initially had been purchasing methamphetamine. Yeager testified about the two drug buys in July 2020, in which Harrell fronted her drugs in anticipation of her reselling them and bringing him the proceeds of the sales. Harrell relied on Yeager to resell the drugs and provide him the

money in a timely manner. Yeager had both a romantic relationship and a business relationship with Harrell over the course of several years, at times living with Harrell at 351½ Ludlow Avenue. When Yeager lived at the Ludlow apartment, she helped to fix it up and got other people to fix it up. At the times of the July 2020 drug buys and the August 2020 execution of a search warrant, it was apparent 351½ Ludlow Avenue was being renovated.

{¶ 124} Barclay testified that between 2018 and 2020, he repeatedly purchased drugs from Harrell in large quantities, receiving at one point roughly ten pounds of methamphetamine a week from Harrell in one-pound increments. The amounts of drugs Barclay obtained were not amounts for personal use, and Harrell was aware, based on the text message conversations and the amounts of drugs he provided to Barclay, that Barclay was reselling the methamphetamine. Barclay also testified that, on rare occasions, Harrell fronted him methamphetamine to sell, and he would pay Harrell back at a later time. For at least some period of time in 2020, Barclay lived in an apartment at 351 Ludlow Avenue. Barclay testified that he had a key to Harrell's upstairs apartment and would access it from time to time at Harrell's direction.

{¶ 125} Blair testified that although he had not personally had any hand-to-hand drug transactions with Harrell, he directly observed Harrell selling methamphetamine to his girlfriend, Foster. Blair explained that he and Foster had worked together and that he "was her co-pilot." The first time Blair met Harrell, he and Foster picked Harrell up to drive to Logan County to sell a quarter pound of methamphetamine. After the transaction was complete, Harrell shared the profits of the sale with Foster while at his Ludlow apartment. Both Blair and Foster used methamphetamine, but they resold the drugs more than they

used in order to maintain their lifestyle. They would purchase anywhere from three-and-a-half grams to a quarter pound of methamphetamine at a time. They also purchased methamphetamine from Barclay to use and/or resell.

**{¶ 126}** With respect to the existence of a pattern of corrupt activity, we conclude that a rational juror could have reasonably inferred from the testimony produced at trial that Harrell's drug trafficking enterprise was ongoing and that Harrell actively engaged in more than one corrupt activity. We have previously stated that uncharged conduct "may constitute the 'corrupt activity' underlying a RICO charge. The state simply must prove beyond a reasonable doubt that the defendant's uncharged conduct violated a statute and that the statutory violation was a 'corrupt activity.' " *State v. Johnson*, 2d Dist. Darke Nos. 1997-CA-1441 and 1997-CA-1444, 1998 WL 57796, *6 (Feb. 13, 1998).

**{¶ 127}** Although Barclay did not testify to the value of the methamphetamine sold to him by Harrell, it would have been reasonable to conclude, based on Blair's testimony and Barclay's text messages with Harrell, that a pound of methamphetamine was worth well over $1,000. According to Blair, during the Covid pandemic, the cost of an ounce of methamphetamine increased from $175 per ounce to $1,000 per ounce. A pound of methamphetamine equals more than 150 times the bulk amount, which is only 3 grams, and its sale constitutes a felony of the first degree. Harrell was providing Barclay with approximately 10 pounds of methamphetamine on a weekly basis while he was in Clark County and continued to provide him with large quantities of methamphetamine until Barclay was arrested in 2020. Barclay's text messages with Harrell between June and August 2020 alone aggregated to more than $1,000 worth of drug trafficking from Harrell

to Barclay. Likewise, Harrell's text messages with other individuals demonstrated that he was selling or offering to sell large quantities of methamphetamine with aggregated values over $1,000.

{¶ 128} In a sufficiency of the evidence review, the question is not "whether the state presented the *best* evidence" but "whether the evidence presented, *when viewed in a light most favorable to the prosecution*, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, at ¶ 16, citing *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus. Considering all the evidence and viewing it in a light most favorable to the prosecution, we conclude that a reasonable juror could have found beyond a reasonable doubt that Harrell had engaged in an illegal drug trafficking enterprise and that he had participated in at least two incidents of corrupt activity that established a pattern of corrupt activity. Therefore, we overrule the portion of Harrell's first assignment of error concerning his Crim.R. 29 motion and we overrule his second and third assignments of error.

## IV. Conclusion

{¶ 129} Having sustained in part Harrell's first assignment of error concerning his unlawful detention, we reverse his convictions and remand the matter to the trial court for further proceedings consistent with this Opinion. Because the State presented sufficient evidence on each of the charged offenses, double jeopardy does not preclude the State from retrying Harrell on all counts.

. . . . . . . . . . . . .

EPLEY, P.J. and HUFFMAN, J., concur.