[Cite as *State v. Harrell*, 2026-Ohio-54.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2024-CA-62 |
| Appellee | : | |
| | : | Trial Court Case No. 21-CR-0408(A) |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| OTHELLO HARRELL | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on January 9, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


For the court,


_____
RONALD C. LEWIS, JUDGE


TUCKER, J., and HANSEMAN, J., concur.

**OPINION**
CLARK C.A. No. 2024-CA-62

JEFFREY R. MCQUISTON, Attorney for Appellant
DANIEL P. DRISCOLL, Attorney for Appellee

LEWIS, J.

{¶ 1} Defendant-Appellant Othello Harrell appeals from the judgment of the Clark County Common Pleas Court convicting him of engaging in a pattern of corrupt activity and two counts of aggravated trafficking in drugs following a jury trial. For the following reasons, we affirm the judgment of the trial court.

## I. Facts and Procedural History

### a. Procedural History

{¶ 2} In June 2021, Harrell was indicted by a Clark County grand jury on one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1), a felony of the first degree ("Count One"); one count of aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(2), a felony of the second degree ("Count Two"); one count of aggravated possession of drugs, in violation of R.C. 2925.11(A), a felony of the second degree ("Count Three"); one count of aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(2), a felony of the third degree ("Count Four"); and one count of aggravated possession of drugs, in violation of R.C. 2925.11(A), a felony of the third degree ("Count Five"). The indictment also included a forfeiture specification for $3,455 in U.S. currency attached to Counts Two through Five. These charges were part of a 122-count indictment involving eight co-defendants: Othello Harrell, Jeremy Barclay, Jeffrey Palmer, Brandy Meyer, Regan Foster, Jayson Blair, Joshua Thompson, and Matthew Simms.

2

{¶ 3} In January 2022, Harrell filed a motion to suppress challenging the lawfulness of a traffic stop and detention and the admissibility of evidence obtained from the searches of his home and cell phone. After a hearing on the matter, the trial court overruled the motion in its entirety. The case proceeded to a jury trial in June 2022, after which Harrell was found guilty as charged on all counts. Harrell was sentenced to an aggregate prison term of 22 to 27½ years, fined more than $12,000, and ordered to forfeit $3,455 in accordance with the forfeiture specification. Harrell timely appealed.

{¶ 4} On appeal, we determined that Harrell had been unlawfully detained by officers when they stopped the car he was driving while detectives were executing a search warrant on his house. *State v. Harrell*, 2024-Ohio-981, ¶ 43 (2d Dist.). We further concluded that evidence obtained during the unconstitutional seizure should have been excluded at trial. *Id*. at ¶ 55. Nevertheless, because the State had presented sufficient evidence on each of the offenses charged, double jeopardy did not preclude the State from retrying Harrell on all counts. We therefore reversed his convictions and remanded the matter to the trial court for further proceedings. *Id*. at ¶ 129.

b. **Testimony of Confidential Informant**

{¶ 5} Upon remand, the case proceeded to a second jury trial, at which the following evidence was presented. In June 2020, detectives from the Springfield Police Department procured a confidential informant ("CI") after she was arrested for stealing from Walmart and found with an ounce of methamphetamine in her possession. The CI testified that she obtained the methamphetamine from Harrell, whom she knew as "Cuz." As part of her agreement with the State, the CI agreed to make controlled buys from Harrell and other individuals in Clark County, Ohio, for the Springfield Police Department.

{¶ 6} The CI testified that she first met Harrell in 2019 at Jeremy Barclay's home when she picked up methamphetamine with her friend, Valentino. The CI was a drug user but was not selling drugs at that time. Barclay was an associate of hers whom she had met a few weeks before meeting Harrell. The CI was aware that Barclay acquired his supply of methamphetamine from Harrell. While at Barclay's home, Harrell proposed that the CI purchase methamphetamine directly from him.

{¶ 7} The next time the CI saw Harrell was at a motel in Springfield, Ohio. The CI was severing ties with Valentino, so Barclay offered to let her stay at the motel for a couple of days. It was convenient for the CI because she was using drugs and Barclay had them. When the CI saw Harrell at the motel, he was dropping something off to Barclay. Although the CI did not recall the details, her interaction with Harrell that day was drug related.

{¶ 8} In June 2020, the CI was living on Dayton Avenue in Springfield and was dating Edwin Ford. She knew that Ford did not like Harrell because Ford suspected the CI was having an affair with Harrell. Ford was also a drug user and obtained methamphetamine from a supplier other than the CI. The CI denied buying methamphetamine from Ford or selling him methamphetamine while she was working as an informant. Ford knew that the CI was working as a confidential informant.

{¶ 9} While the CI was living on Dayton Avenue, Harrell sometimes came over uninvited. Harrell provided drugs to the CI at her home, and it was common for Harrell to front her drugs, which he did on more than one occasion. Harrell provided the CI drugs and told her a price, then she sold the drugs and paid Harrell out of the proceeds. The CI earned a profit from the sales she made.

{¶ 10} The last time Harrell provided drugs to the CI at the Dayton Avenue address was in July 2020. On that occasion, Harrell came over unannounced and fronted her drugs.

4

Harrell wanted $500 for them. The CI took the drugs, put them in her kitchen cabinet, and called the detectives. She did not open the drugs, tamper with them, or use any of them. Ford knew about the drugs and had access to the kitchen cabinet, but the CI denied that Ford used any of the drugs or tampered with any of them before she turned the drugs over to the police. However, she admitted on cross-examination that she did not watch Ford twenty-four hours a day. The detectives did not pick up the drugs for a couple of days.

{¶ 11} Because Harrell had fronted the methamphetamine to the CI, the police gave her $500 to pay Harrell for the drug debt. When the CI met up with Harrell at his house to pay him the money, she requested additional drugs. She obtained an additional quarter of an ounce of methamphetamine from Harrell who set a price of $100 for the drugs. The CI told Harrell that she was going to get rid of the drugs and return later that day with the money. The CI took the drugs to the police who again provided her with money to pay Harrell for the drugs. She then returned to Harrell's apartment and gave him the money she owed.

{¶ 12} Both of the CI's controlled buys with Harrell occurred at his home on Ludlow Avenue and were audio and video recorded. According to the CI, her vehicle was searched by the detectives prior to her interactions with Harrell, but not her person. The CI did not recall whether the trunk of her vehicle was searched.

{¶ 13} The relationship between the CI and Harrell eventually turned romantic. At some point, the CI began residing in Harrell's home on Ludlow Avenue in Springfield. She worked on the property and sometimes gave Harrell money, but there was no steady rent paid or rental agreement.

{¶ 14} The CI admitted she had prior misdemeanor convictions for theft, disorderly conduct, and a DUI. She further testified that she had felony convictions for misuse of a credit card and possession of marijuana. At the time of trial, the CI was in a Texas jail

5

serving time on a probation violation for her felony marijuana conviction. The CI stated she had started using drugs in 2007 and made a lot of mistakes because of it. Her drug use also affected her ability to recall dates. Although the CI was not supposed to be using drugs while she worked as a CI, she did use them. At the time of trial, the CI had been clean for eight months.

### c. Testimony of Springfield Police Detective Calvin Burch

{¶ 15} Detective Calvin Burch of the Springfield Police Department testified that he had worked for Springfield for approximately 10 years and was assigned as a detective in the intelligence unit. At the time of trial, Detective Burch had been assigned as a task force officer with the Drug Enforcement Administration for 3 years.

{¶ 16} In the first four years of his employment with the Springfield Police Department, Detective Burch worked as an officer on uniform patrol. During that time, Detective Burch conducted a traffic stop on a vehicle driven by Jeremy Barclay. The vehicle was searched, and officers located several firearms, methamphetamines, drug packaging items, and body armor. Barclay was ultimately arrested, charged, and convicted based on that traffic stop, and he was placed on community control sanctions in 2017 or 2018.

{¶ 17} After Detective Burch became a detective, he investigated James Messer, who was suspected of trafficking large quantities of methamphetamine throughout Springfield. Police located Messer at a motel and arrested him on an active warrant. Law enforcement obtained a search warrant for the motel room where Messer was staying and located approximately a pound of methamphetamine, firearms, and several cell phones. Detective Burch obtained search warrants for Messer's cell phones and Facebook page. Messer's records indicated he was trafficking in large amounts of narcotics throughout Springfield and was selling to Barclay, Foster, and Meyer.

6

{¶ 18} Several months later, in early 2020, Detective Burch was involved in an investigation of Gary Osborne. Law enforcement attempted to arrest Osborne at a hotel in Springfield, but he fled in a motor vehicle and eventually crashed. When Osborne was arrested, he had narcotics and a firearm in his possession. Officers returned to Osborne's hotel room and Foster answered the door. She consented to a search of the room, and officers located drugs, drug paraphernalia, and multiple cell phones. A subsequent search warrant was obtained for the cell phones. Data from the phones reflected that Foster had sold narcotics in Springfield and obtained the drugs from Barclay.

{¶ 19} Detective Burch was aware, based on his knowledge, training, and experience, that hotels and motels are commonly used for drug trafficking and drug use. Detective Burch testified that it was common for drug traffickers to have more than one cell phone.

{¶ 20} Detective Burch came across the CI when she was arrested at Walmart for shoplifting and possession of approximately an ounce of methamphetamine, which was indicative of trafficking. The CI agreed to work as a confidential information and disclosed information about several individuals in Springfield who sold drugs. Detective Burch obtained details on those individuals, including where they stayed, what vehicles they drove, what phone numbers they used, and where they conducted most of their business. Based on the information the CI provided, Detective Burch was able to independently verify the information to be truthful. The CI signed a written agreement on June 24, 2020, to work off her charges from the Walmart incident by acting as a CI. Detective Burch was aware that Ford knew the CI was working as an informant, but he did not terminate the agreement even though it was prohibited. Likewise, although the CI was not supposed to be using drugs

7

per the agreement, it would not have surprised Detective Burch if she had continued to use drugs while working as a CI.

{¶ 21} Detective Burch explained that most people who have become CIs were in legal trouble, and he has offered them an opportunity to improve their situation. Most CIs have past criminal histories, including the CI in this case. Many CIs are addicted to drugs and are generally people embedded in the drug trade that can go places where other people, such as law enforcement, cannot. The goal of the investigation was to get upper-level drug dealers off the street.

{¶ 22} As part of Detective Burch's investigation, he subpoenaed Barclay's Facebook records. The Facebook records reflected that Barclay was selling a lot of narcotics in Springfield. Barclay's messages indicated he sold drugs to Palmer, Thompson, and Foster. Foster was known to be in a relationship with Blair. The drug transactions in the Facebook records reflected that Barclay had been selling drugs to others but not that people had been selling to him. There were additional messages between Barclay and "DonJuan Sheppard," whom Detective Burch believed was Harrell. The Facebook messages indicated Barclay tried to obtain drugs from "DonJuan Sheppard."

{¶ 23} During the pendency of the investigation, Barclay stayed in multiple locations in Clark County, including hotels and 351 Ludlow Avenue. 351 Ludlow Avenue was the downstairs portion of a duplex-style house, while 351½ Ludlow Avenue was the upstairs portion of the duplex. Detective Burch conducted surveillance on the residence and researched the house to determine who lived there. Detective Burch observed Harrell using the upstairs portion of the residence. During the CI's interview, she provided information about an individual who had lived on Emerson in Dayton, Ohio, whom she knew as "Cuz" and thought was named Don or DonJuan. Harrell's full name was later determined

8

to be Othello DonJuan Harrell. Records showed that Othello DonJuan Harrell owned a residence on Emerson in 2018 or 2019 before he sold it. Vehicles parked outside of 351 Ludlow Avenue were owned by Harrell's family members. The CI verified Harrell was the person she knew as "Cuz" who was living out of 351½ Ludlow Avenue.

{¶ 24} In July 2020, Detective Burch received a phone call from the CI who stated that Harrell had come to her house on July 6, 2020, and dropped off an ounce of methamphetamine. Harrell expected her to sell the methamphetamine and pay him $500 for it later. The CI indicated she put the drugs in her kitchen cabinet. The incident was not planned and none of the officers in Detective Burch's unit were able to collect the drugs for a couple of days. On July 9, 2020, officers met up with the CI in a parking lot where she turned over the drugs. Those drugs were later tested and verified to be 20.78 grams of methamphetamine. The detectives came up with a plan to give the CI $500 to pay Harrell for the drugs and then have the CI request additional drugs.

{¶ 25} On July 10, 2020, the detectives had the CI use an undercover phone to contact Harrell in their presence. The CI called Harrell, but he did not answer. She then texted him and Harrell told her to call him. When the CI called back, the phone call was recorded and submitted as State's Exhibit 26. Detective Burch identified Harrell's voice on the recording.

{¶ 26} After the recorded phone call, Detective Burch gave the CI $500 of recorded buy money. The detectives searched the CI and her car, including the trunk, provided her with an audio-visual recording device with GPS, and kept surveillance on her. The CI's recording device showed that she met up with Harrell and turned over the money. She then asked for additional drugs to sell. Harrell went into a drawer, pulled out some

9

methamphetamine, weighed it, and gave it to the CI. Harrell expected the CI to pay him $100 for the drugs after she sold it.

{¶ 27} The CI returned to the detectives with the additional methamphetamine and turned them over. Those drugs were later submitted to the lab and verified to be 8.09 grams of methamphetamine. The officers searched the CI and her vehicle again and then gave her an additional $100 of recorded buy money to provide to Harrell. The CI returned to Harrell's residence that same day and gave him the $100 of recorded buy money for the methamphetamine.

{¶ 28} Detective Burch explained that the COVID-19 pandemic occurred during the time frame of the indictment. As a result of the pandemic, the cost of street drugs significantly increased. At the time of trial, an ounce of methamphetamine could be purchased for about $100. During the pandemic, however, the cost of an ounce of methamphetamine was anywhere between $500 and $1,000. Because the borders were shut down, it was harder for people to get drugs, so the prices increased. In September 2020, the going rate for 20 grams of methamphetamine was between $400 and $800. Detective Burch testified that 3 grams of methamphetamine is the bulk amount, and methamphetamine is classified as a schedule II controlled substance.

{¶ 29} As part of Detective Burch's investigation, he obtained a search warrant for Harrell's cell phone pings that covered the dates from July 13, 2020, to August 27, 2020. The pings suggested that Harrell was staying at 351 ½ Ludlow Avenue and, at other times, in Dayton. During his surveillance, Detective Burch watched Harrell leave the residence on Ludlow Avenue at the same time as the cell phone pings travelled away from the residence, reflecting that the phone was in Harrell's possession.

{¶ 30} Detective Burch also sent an administrative subpoena to a phone company to obtain call detail records and subscriber information for Harrell's cell phone number. The subscriber information did not return to Harrell, which Detective Burch explained was not unexpected as drug traffickers typically did not put cell phone numbers in their own name. The call detail records were entered into a system called PLX, which organized the phone numbers in order of what number was most contacted. The results were provided in what Detective Burch called a "hot list." The hot list for Harrell's phone showed that the top contact was the phone number associated with Barclay, and they had talked or texted 984 times from July 13, 2020, to August 27, 2020. The number associated with the CI was the second most frequently contacted during that time frame, with 519 calls or texts. The phone number attributed to Foster and Blair ranked number 31 in most frequent contacts during that same time frame with 46 calls or texts.

{¶ 31} In August 2020, Detective Burch obtained and executed a search warrant for 351½ Ludlow Avenue. Officers recovered a digital scale next to a plate with residue, a credit card, and a spoon with residue. A box of gallon-size plastic bags was discovered near the drug paraphernalia. Detective Burch explained that the spoon was used to scoop out the drugs and put them onto the plate, where the credit card was used to separate the drugs into whatever amount was needed. The scale was used to measure out the drugs to be sold, and then the drugs were placed into the plastic bags to be distributed. Two one-gallon-size bags with suspected methamphetamine were recovered from the apartment and sent to the lab. One bag was found to have methamphetamine residue, and the other bag had .11 grams of methamphetamine. The drugs and paraphernalia were found in Harrell's bedroom. Officers also located a sock in Harrell's bedroom that contained seven 7.62 bullets in it. The bullets were not tested for DNA.

{¶ 32} Detective Burch testified that at one point during the case, Harrell told him, "you got me, I was done, but you got me." Trial Tr. 796. Detective Burch identified recordings of jail calls in which Harrell discussed information about his case, including referencing the same statement above directed toward Detective Burch. During one phone call, Harrell discussed the phone number that was associated with him during the investigation, stating that it was an old number. In another jail call, Harrell mentioned some of his co-defendants and the CI as being involved in the case, and he referenced being on camera, which Detective Burch understood to mean the controlled-buy videos. In another jail call, Harrell talked about how there was no enterprise and Barclay was his own independent drug dealer selling to whomever he wanted and if Harrell did not have the drugs, then Barclay would get them from somewhere else.

{¶ 33} Detective Burch testified that Harrell brought methamphetamine to Clark County and sold it to Barclay and Foster, who then sold the drugs to the other co-defendants and users. Barclay's Facebook records indicated that he sold fentanyl, cocaine, heroin, and pills in addition to methamphetamines. Although the indictment included various charges for the co-defendants involving drugs other than methamphetamines, Harrell, specifically, was dealing methamphetamines, and he was the head of the enterprise. Likewise, although other individuals could have potentially been charged and included as part of the enterprise, the detective and the prosecution decided to limit the scope of the indictment to the eight indicted individuals. Detective Burch explained that some of the other individuals who could have been charged were charged separately and convicted.

### d. Testimony of Springfield Police Detective Justin Allender

{¶ 34} Springfield Police Detective Justin Allender testified that he had been a police officer since February 2011 and had joined the Springfield Police Department in June 2016.

Detective Allender was assigned to the narcotics unit with Detective Burch.

{¶ 35} When working on controlled purchase operations, Detective Allender explained that the lead detective or the co-case investigator would put together an operational plan, which detailed what the officers were doing, the operation mission, what they were trying to gain as evidence, and background history of the investigation. Operational plans included surveillance people, arrest teams, and medical personnel. If the plan involved a CI, a rescue team would be included. Prior to a controlled purchase operation, the whole team would be briefed on each of their roles, and the CI would be given a recording device provided by the police department to use during the operation.

{¶ 36} Detective Allender testified that in July 2020, he was involved in a controlled purchase operation involving Harrell. On July 9, 2020, officers recovered approximately 20 grams of methamphetamine from the CI. The next day, Detective Allender assisted in what he considered the first controlled buy for Harrell. Although it was uncommon for the police to pay a drug debt, in this case, the CI had been fronted with an ounce of methamphetamine by Harrell, and she did not have the money to pay for it. The situation had not been prearranged, and the officers had not had time to immediately retrieve the evidence. The officers decided to pay the drug debt and instructed the CI to request more drugs from Harrell. The officers met with the CI on July 10, 2020, at a designated location and searched her person and car. They provided her with $500 of pre-recorded buy money and set up surveillance. A live stream video recorded the transaction so that the officers could watch the events as they unfolded in real time. A copy of the video was submitted as State's Exhibit 1.

{¶ 37} Detective Allender testified that the CI went to 351½ Ludlow Avenue in Springfield. There was some kind of ongoing renovation inside the home, and several

construction workers were present. Despite the construction, it was believed that Harrell was staying at the residence in some capacity and had a bedroom there. The CI turned over the $500 buy money to Harrell and asked for additional drugs. Harrell indicated he only had 7 or 8 grams of methamphetamine left, which he then packaged up and handed to the CI. Harrell instructed the CI he wanted $100 for the drugs. After leaving 351½ Ludlow Avenue, the CI met back up with the detectives and turned over approximately 8 grams of methamphetamine. An additional $100 of recorded buy money was provided to the CI to pay Harrell, who returned to Harrell's residence and gave him the money.

### e. Testimony of Intelligence Analyst Kara Robb

{¶ 38} Kara Robb, an analyst with the Ohio Narcotics Intelligence Center ("ONIC") since 2019, testified as an expert in public safety intelligence analytics. Robb explained that she worked in the intelligence area of the ONIC in which she assisted law enforcement agencies by providing various analyses for their cases.

{¶ 39} If law enforcement requested assistance, ONIC would send any submitted devices to the forensic unit and extract the information into a Cellebrite reader, which would provide information extracted from the device, including message content, calls, images, and videos. In addition to Cellebrite, ONIC also used PLX and law enforcement databases to obtain information. Once data was entered into any of the systems, it could not be altered in any way. The intel unit would then analyze the information and put together an intelligence report for the police department.

{¶ 40} Robb was asked to analyze several cell phones and Facebook records collected by the Springfield Police Department. Robb created a case portfolio based on the information collected and analyzed. The portfolio was provided to the detectives, which allowed them to quickly reference information about their case.

14

{¶ 41} The portfolio included a timeline of significant events that occurred from July 2020 to April 2021 involving Harrell and his co-defendants. Each co-defendant had a suspect profile that included their personal identifiers, social media account information, and case notes provided by the Springfield Police Department. The portfolio included a glossary of terms compiled from the message content of the analyzed devices. The meanings of the terms were derived from the context of the messages, DEA sources, and Robb's training, knowledge, and experience. Robb testified that an ounce of methamphetamine is considered an amount for resale rather than personal use.

{¶ 42} Based on the Springfield Police Department's investigations and the context of messages from the co-defendants' devices and records, Robb asserted that Harrell supplied Barclay and Foster with drugs. Barclay was believed to have supplied Palmer, Thompson, and Foster with drugs. Foster was believed to have supplied Blair and Simms.

{¶ 43} Barclay had numerous communications with Palmer, Thompson, Meyer, Harrell, Blair, and Foster from March 5, 2019, to August 28, 2020, when Barclay was arrested. Barclay and Harrell communicated 68 times via telephone from March 5, 2019, to April 19, 2020, and 50 times via Facebook from February 21, 2020, to August 28, 2020. Harrell was saved in Barclay's phone as "Cuz," and his Facebook page name was "DonJuan Sheppard."

{¶ 44} Barclay's cell phone extraction report revealed a March 8, 2020 conversation between Barclay and Harrell, in which Barclay solicited Harrell into having a "steady relationship." Harrell appeared to have agreed and instructed Barclay to meet him at 351 Ludlow Avenue. Additional conversations from the cell phone extraction report and Facebook records indicated drug activity in which Barclay tried to obtain drugs from Harrell.

15

{¶ 45} Foster's cell phone extraction records indicated that she likely supplied drugs to Blair and Simms. Based on the context of the messages, Blair and Foster appeared to be in a romantic relationship and shared cell phones. At least one of the cell phones shared by Blair and Foster may also have been shared by Barclay. From March 12, 2020, to June 28, 2020, Foster had 50 communications with Harrell, who was identified in her phone as "Cuz."

{¶ 46} Two additional portfolios were created based on records obtained in relation to Barclay and Blair and Foster's shared phones. The records reflected additional drug communications between the co-defendants and various individuals, including contacts believed to be Harrell. Barclay's report indicated that he had four potential drug suppliers, one of which was Harrell.

### f. Testimony of Jayson Blair

{¶ 47} Jayson Blair testified on behalf of the State. He stated that he was in prison due to drug trafficking charges in the pending case. Blair had entered an agreement with the State to testify against Harrell. During the course of the case, Harrell had threatened Blair by stating that he "had cheese on [Blair's] head," which to Blair meant that Harrell was going to have him killed for snitching. Trial Tr. 640.

{¶ 48} Blair testified that he knew Harrell through one of the other co-defendants, Regan Foster, whom he had dated. Blair knew Harrell by the name "Cuz." Blair met Foster through a friend in the winter of 2019. The first time Blair met Harrell, Foster picked Blair up from his house for a "play," meaning a drug deal, in Logan County. Foster had recently had some things stolen and needed some help getting back on her feet. Foster contacted Harrell to obtain a quarter pound of methamphetamine for the play, and Foster drove Blair to Harrell's house on Ludlow Avenue. At that time, Harrell did not know Blair

16

yet and was not comfortable with Foster taking the drugs, so he wanted to be present for the transaction. Foster, Blair, and Harrell drove to Logan County together, sold the drugs, and returned to Harrell's house, where Harrell split the proceeds with Foster.

{¶ 49} Blair and Foster were both addicted to methamphetamines. Blair saw Foster purchase methamphetamine from Harrell in amounts ranging from a few ounces up to a quarter pound. Foster resold most of the drugs she purchased. Foster wrote in a notebook whom she sold drugs to and what she sold them. Foster liked to keep track of the amounts because she would often front people drugs. When Foster and Blair were arrested, the notebook was seized.

{¶ 50} Blair used mostly methamphetamines, but he also used fentanyl. When he first started using methamphetamine, he used a tenth of a gram. However, because of his continued use, the amount increased over time. Blair sold drugs to pay for his own addiction. Blair had been clean since February 11, 2021, when he got arrested. At the time of his arrest, several cell phones were confiscated by the police. Blair and Foster shared some of the phones that they used primarily to sell drugs, and they lived out of hotels.

{¶ 51} Blair never personally purchased drugs from Harrell, but he saw Foster purchase drugs from Harrell. Because Blair and Foster were dating, their money was commingled, and Foster would use their combined money to purchase drugs from Harrell. The drug transactions Blair witnessed between Harrell and Foster occurred in Clark County. From the time that Blair met Foster until they were arrested in August 2020, Blair recalled that most of the time they met up with Harrell to get drugs was at Harrell's house on Ludlow Avenue.

{¶ 52} From 2019 to July 2021, Blair and Foster occasionally pooled their money with other people to buy drugs. This included Palmer, Thompson, Meyer, and Simms. On one

17

occasion, several of them pooled their money together to purchase $7,000 worth of drugs from a dealer in Dayton. Those couple pounds of drugs were not purchased from Harrell. Once they got the drugs, they split them up depending on who put what amount of money into the pool and then resold the drugs.

{¶ 53} In August 2020 after Foster and Blair were arrested, Harrell stopped dealing directly with Foster. When they were released from jail, Harrell refused to supply them because Harrell claimed they were "too hot to mess with." Trial Tr. 637. According to Blair, the concern was that because he and Foster had recently been arrested, the police could have been watching them.

{¶ 54} Blair also knew Barclay and was aware that Harrell supplied Barclay with methamphetamines, which Barclay then resold. Blair had met Barclay through Foster. Blair testified that Barclay, Simms, Palmer, Meyer, and Thompson all sold drugs and used drugs. Blair never heard of Harrell using drugs, just selling them.

{¶ 55} Foster and Blair had drug suppliers other than Harrell. People who dealt drugs usually had more than one supplier. In Blair's experience, drug dealers typically kept their circles small. Blair testified that the purpose of the enterprise was to make money, which they accomplished by selling drugs.

### g. Testimony of Jeremy Barclay

{¶ 56} Jeremy Barclay testified on behalf of the State. Barclay was in prison at the time of trial, but not because of the underlying indictment. Pursuant to an agreement to testify against his co-defendants, Barclay's charges in the underlying indictment were dismissed.

{¶ 57} Harrell was Barclay's drug dealer and also his landlord. At one point they were very good friends. Barclay had known Harrell since 2018 when they met through a

18

mutual friend while doing a methamphetamine drug deal in Dayton. At first, Barclay traveled to Harrell, who lived in Dayton, to purchase methamphetamines. The amounts purchased varied from a quarter of an ounce to an ounce depending on how much money Barclay had available. Once Barclay started to purchase more methamphetamines, Harrell traveled to Springfield and eventually resided in Springfield temporarily.

{¶ 58} In 2018, Barclay lived on Bell Street, and Harrell brought methamphetamine to him at that address. On September 9, 2019, Barclay was incarcerated and remained so until February 2020. Once he was released, Barclay lived on Douglas where he continued to sell drugs. On April 20, 2020, Barclay was shot and moved to his mother's house to recover. He remained at his mother's home for about a month, after which he then moved into Harrell's apartment on Ludlow Avenue.

{¶ 59} Barclay lived in Harrell's property on Ludlow Avenue in the downstairs apartment. In exchange for Barclay staying in the downstairs apartment, Barclay did work on the upstairs apartment. While Barclay lived on Ludlow Avenue, he was not permitted to sell drugs out of the house. Barclay was also supposed to fix up the place. Harrell kicked Barclay out of the apartment in July 2020. After leaving the Ludlow Avenue apartment, Barclay lived in various hotels and motels until he was arrested in August 2020, and he remained incarcerated through the time of trial.

{¶ 60} During the period of the indictment, Barclay made hundreds of methamphetamine purchases from Harrell. The largest quantity of methamphetamine that Barclay purchased from Harrell was one pound. Barclay normally purchased four ounces, or a quarter pound, from Harrell every day or every other day. Some days Barclay bought a quarter pound multiple times a day. In a week, Barclay purchased anywhere from five to ten pounds of methamphetamine from Harrell. This went on for months. During that time,

Barclay paid between $400 and $800 per quarter pound, depending on the quality of the methamphetamine. Barclay profited from his sales but did not recall how much profit he made because he spent money as soon as he got it. Barclay did not pay taxes on the profits of his drug sales, but he used some of his profits to fix up Harrell's property on Ludlow Avenue when he lived there.

{¶ 61} Barclay never sold drugs to Harrell, and he did not know Harrell to use drugs. Barclay did not have the kind of connections that Harrell had to obtain large quantities of methamphetamine. There were times that Harrell did not sell drugs to Barclay because Harrell did not need the money. During those times, Harrell had cars, money, and whatever he needed. Only on rare occasions was Harrell unable to get methamphetamine for Barclay when Barclay asked for it.

{¶ 62} Barclay resold methamphetamine he obtained from Harrell. Barclay knew Blair, Foster, Palmer, Meyer, Simms, and Thompson to use drugs. He sold drugs to them, but they did not sell drugs to Barclay. A typical personal use amount was between a gram and a half ounce. Barclay usually sold his co-defendants an ounce of methamphetamine. Based on the amount of drugs Barclay sold to the co-defendants, he knew they were going to resell it. He rarely fronted drugs to any of them. Although Barclay understood the indictment to be based on an enterprise of methamphetamine trafficking, the codefendants also bought and sold other drugs.

{¶ 63} Barclay communicated with Harrell via Facebook and telephone. Barclay identified his Facebook conversations with "DonJuan Sheppard" as communications with Harrell. From June 1, 2020, to July 1, 2020, Barclay had regular conversations via cell phone with Harrell, the majority of which were drug related.

{¶ 64} Barclay considered himself an independent drug dealer in that he worked alone, but he acknowledged that he had to work with others to purchase drugs and sell them. Each of the co-defendants had some involvement in bringing methamphetamine into Clark County. Barclay did not necessarily work directly with each of the co-defendants, but he worked indirectly with all of them. Harrell did not tell Barclay whom to sell to or to keep the drugs only in Clark County. Because of the amount of drugs Harrell sold Barclay, Harrell knew Barclay was going to resell it. Barclay was not aware of the other people Harrell sold drugs to. According to Barclay, Harrell was "very secretive of his affairs." Trial Tr. 720.

### h. Other Evidence, Verdict, and Sentence

{¶ 65} In addition to the above evidence, the parties stipulated to the drug analysts' reports identifying the respective quantities and compositions of drug evidence, which were varying amounts of methamphetamines.

{¶ 66} Following the conclusion of trial, the jury found Harrell guilty as charged in the indictment. At sentencing, the trial court merged Counts Two and Three with each other and Counts Four and Five with each other. The State elected to proceed to sentencing on Counts Two and Four. On Count One, the trial court imposed an indefinite prison term of 11 years to 16½ years. The court imposed an indefinite prison term of 8 years to 12 years for Count Two and a definite prison term of 3 years on Count Four. The trial court ordered the sentences to be served consecutively to each other for a total stated indefinite prison term of 22 to 27½ years. A mandatory minimum fine of $7,500 was imposed for Count Two and a mandatory minimum fine of $5,000 was imposed for Count Four.

{¶ 67} Harrell filed a timely appeal.

### II. Sufficiency of the Evidence

{¶ 68} In his first assignment of error, Harrell makes the following argument:

21

Appellant's conviction for engaging in a pattern of corrupt activity is not supported by sufficient evidence to satisfy the requirements of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

{¶ 69} In this assignment of error, Harrell argues there was no enterprise or "association-in-fact" because there was no evidence presented that he associated with four of his co-defendants, namely, Palmer, Meyer, Thompson, and Simms. He further argues that there was no structure to constitute an enterprise. We do not agree.

{¶ 70} Whether a verdict is supported by sufficient evidence is a question of law, which an appellate court reviews de novo. *State v. Jordan*, 2023-Ohio-3800, ¶ 13, citing *State v. Groce*, 2020-Ohio-6671, ¶ 7. "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. McKnight*, 2005-Ohio-6046, ¶ 70, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 71} Harrell was charged in Count One with engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A). "R.C. 2923.32 and associated statutes set forth Ohio's version of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961– 1968, commonly referred to as the 'RICO Act.'" *State v. Stevens*, 2014-Ohio-1932, ¶ 2. R.C. 2923.32(A)(1) provides: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." Engaging in a pattern of corrupt activity is a felony of the second degree. R.C. 2923.32(B)(1). If at least one of the

incidents of corrupt activity is a felony of the first, second, or third degree, then the offense is elevated to a felony of the first degree. *Id.*

{¶ 72} The State alleged that Harrell engaged in a pattern of corrupt activity as a continuing course of conduct from on or about September 9, 2019, to on or about June 28, 2021. According to Harrell's indictment, the predicate offenses of corrupt activity included trafficking in drugs and the collection of an unlawful debt.

{¶ 73} An "enterprise" is defined to include "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). "'Enterprise' includes illicit as well as licit enterprises." *Id.* "[T]he existence of an enterprise, sufficient to sustain a conviction for engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1), can be established without proving that the enterprise is a structure separate and distinct from a pattern of corrupt activity." *State v. Beverly*, 2015-Ohio-219, ¶ 13.

{¶ 74} A "pattern of corrupt activity" means "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E). Relevant here, "corrupt activity" means engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any violation of R.C. 2925.03, which is the drug trafficking statute, when the value of the contraband possessed, sold, or purchased in the violation or combination of violations exceeds $1,000. R.C. 2923.31(I)(2)(c). Because the statute allows for a combination of violations, individual

transactions can be aggregated to form a single corrupt activity. *State v. Kolle*, 2022-Ohio-4322, ¶ 38 (4th Dist.).

{¶ 75} R.C. 2925.03 includes two ways to traffic drugs under the circumstances of this case. First, a violation of the statute could have been committed by knowingly selling or offering to sell a controlled substance. R.C. 2925.03(A)(1). Second, a violation of the statute could have been accomplished by knowingly preparing for shipment, shipping, transporting, delivering, preparing for distribution, or distributing a controlled substance, when the offender knew or had reasonable cause to believe that the controlled substance was intended for sale or resale by the offender or another person. R.C. 2925.03(A)(2).

{¶ 76} Testimony at trial reflected that methamphetamine is a schedule II controlled substance, and the bulk amount of methamphetamine is 3 grams. R.C. 2925.01(D)(1)(g); Adm.Code 4729:9-1-02(C)(2). Pursuant to R.C. 2925.03(C)(1)(c), if the amount of methamphetamine involved equaled or exceeded the bulk amount, but was less than five times the bulk amount, i.e., 15 grams, the offense constituted a felony of the third degree. Pursuant R.C. 2925.03(C)(1)(d), if the amount of methamphetamine involved equaled or exceeded five times the bulk amount, but was less than fifty times the bulk amount, i.e., 150 grams, the offense constituted a felony of the second degree. Any amount of methamphetamine exceeding 150 grams constituted a felony of the first degree. R.C. 2925.03(C)(1)(e)-(f).

{¶ 77} When considering the RICO charge in Count One of the indictment and viewing the evidence in the light most favorable to the prosecution, a rational juror could have reasonably concluded that Harrell was engaged in an illicit enterprise of trafficking in drugs for profit. The enterprise was not a legal entity, but rather an "association-in-fact" enterprise. In considering the federal RICO statute, which is materially similar to Ohio's

24

RICO statute, the United States Supreme Court has concluded that "an association-in-fact enterprise need not have a formal structure, but must have at least the following features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *State v. Dent*, 2020-Ohio-6670, ¶ 19, quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009).

{¶ 78} "The definition of 'enterprise' is remarkably open-ended." *Beverly*, 2015-Ohio-219, at ¶ 8. As the Ohio Supreme Court stated, "the existence of an enterprise, sufficient to sustain a conviction for engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1), can be established without proving that the enterprise is a structure separate and distinct from a pattern of corrupt activity." *Id*. at syllabus. Notably, the same evidence can be used to prove both the existence of an enterprise and the associated pattern of corrupt activity. *Id*. at ¶ 7.

{¶ 79} "One way the State can show that a person was employed by or associated with an enterprise is by showing that the person entered into a conspiracy with another person who was a member of that enterprise." *State v. Brown*, 2025-Ohio-2804, ¶ 21. "A person who merely agrees 'to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity brings [him or her] within the conspiracy.'" *Id*., quoting *United States v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991). Although not all drug sales involve a conspiracy, "when a buyer agrees with the seller to distribute the drugs that the buyer purchased, a conspiracy forms because 'there is an agreement beyond the mere sale for personal consumption.'" *Brown* at ¶ 23, quoting *United States v. Kozinski*, 16 F.3d 795, 808 (7th Cir. 1994).

{¶ 80} The evidence at trial established that Harrell was an upper-level drug dealer responsible for supplying lower-level drug dealers and users in Springfield with

methamphetamine. He was not himself a user, and he did not buy methamphetamine from any of the people to whom he sold drugs. Harrell sold and fronted large quantities of methamphetamines to the CI, Barclay, and Foster, knowing or having reasonable cause to believe that they would resell the drugs. The CI, Barclay, and Foster participated in committing corrupt activities, and Harrell's relationships and ongoing conduct with each of them sufficiently demonstrated an illicit enterprise of drug trafficking for profit. The remaining co-defendants participated in the conduct of the affairs of the enterprise by agreeing to further distribute the drugs. "Like the federal act, R.C. 2923.32 is designed 'broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways.'" *Brown* at ¶ 32, quoting *H.J. Inc. v. Northwestern Bell Tel. Co*., 492 U.S. 229, 248-249 (1989). A particular defendant who is a party to the conspiracy need not know the identity, or even the number, of other persons involved in the same enterprise. *State v. Siferd*, 2002-Ohio-6801, ¶ 43 (3d Dist.), quoting *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978). Therefore, whether Harrell knew of the involvement of the four other co-defendants is irrelevant because the evidence reflects that he was associated with the same drug trafficking enterprise and participated in its affairs through a pattern of corrupt activity.

{¶ 81} The evidence overwhelmingly established that Harrell was engaged in an ongoing business of trafficking in drugs to multiple individuals. Harrell's drug dealing was directly assisted by the CI, Barclay, and Foster. There was ample evidence that Harrell fronted methamphetamine to the CI and Barclay with the intention of having the drugs resold. Evidence of fronting drugs suggests more than a mere buyer-seller arrangement and "'evidence of fronting coupled with evidence of repeat drug purchases is sufficient "to distinguish a conspiracy from a nonconspiratorial buyer-seller relationship."'" *Brown* at

26

¶ 24, quoting *United States v. Gallegos*, 784 F.3d 1356, 1360 (10th Cir. 2015), quoting *United States v. Johnson*, 592 F.3d 749, 755, fn. 5 (7th Cir. 2010).

{¶ 82} The hot list for Harrell's phone showed that the top caller was Barclay, with whom he had talked or texted 984 times from July 13, 2020, to August 27, 2020. Barclay testified that most contacts he had with Harrell involved drug activity. The CI was the second most frequently contacted person on Harrell's phone during that time frame, having talked or texted with Harrell 519 times. The phone number attributed to Foster and Blair ranked number 31 in most frequent contacts during that time with 46 calls or texts. Additionally, Harrell, Barclay, and the CI at times lived in Harrell's home on Ludlow Avenue. Barclay used proceeds of drug sales to fix up the home for Harrell's benefit. Harrell distributed drugs and/or profits from drug sales out of the Ludlow Avenue residence to the CI, Barclay, and Foster. Blair testified that when he saw Foster purchase drugs from Harrell, the transactions occurred at Harrell's Ludlow Avenue home.

{¶ 83} Although the CI was not listed in the indictment as a co-defendant, this did not preclude Harrell's interactions with her from being considered as part of the enterprise. She was essentially granted immunity for her involvement by agreeing to act as a CI and testify against Harrell. The CI testified that it was not uncommon for Harrell to front her methamphetamine for her to resell and she profited from the resale of the methamphetamine. By fronting the CI drugs, Harrell had a direct interest in the CI's transactions and the proceeds from the drugs she resold.

{¶ 84} The CI testified to two drug buys in July 2020, where Harrell had fronted her methamphetamine with the expectation of her reselling it and providing him with the proceeds. The first buy involved just over 20 grams of methamphetamine, for which Harrell had instructed the CI to pay him $500 in return. The second buy involved approximately 8

grams of methamphetamine, for which Harrell had instructed the CI to pay him $100 in return. Both drug debts were paid off with money from the Springfield Police. It was also disclosed that the ounce of methamphetamine the CI was found with at Walmart was from Harrell, which one could reasonably infer was likewise valued around $500.

{¶ 85} Barclay testified that at various points Harrell was his drug dealer, landlord, and friend. Barclay never sold drugs to Harrell, and Harrell was not known to use drugs. Barclay did not have the kind of connections that Harrell had to purchase large quantities of methamphetamines, and Harrell was very secretive of his affairs. Between September 2019 and June 2021, Barclay purchased methamphetamines from Harrell hundreds of times. Barclay stated that he repeatedly purchased drugs from Harrell in large quantities, receiving at one point roughly five to ten pounds of methamphetamines a week from Harrell in quarter-pound increments. Barclay typically purchased a quarter of a pound from Harrell every day or every other day. The amount of drugs Barclay obtained from Harrell were far above the level for personal use. Barclay also testified that on occasion Harrell fronted him with methamphetamines to sell. Barclay paid between $400 and $800 per quarter pound, depending on the quality of the methamphetamine, and he made a profit from selling the drugs to others.

{¶ 86} Barclay sold methamphetamine that he obtained from Harrell to Palmer, Blair, Foster, Meyer, Simms, and Thompson. Based on the amount of drugs Barclay sold to the co-defendants, which was typically an ounce of methamphetamine, he knew they were going to resell it. Although he sold drugs to them, they did not sell drugs to Barclay. Barclay fronted drugs to them on rare occasions. Accordingly, Palmer, Meyer, Simms, and Thompson were associated with the same drug trafficking enterprise as Harrell.

{¶ 87} For a few months in 2020, Barclay lived in the lower apartment at 351 Ludlow Avenue. Harrell instructed Barclay that he was not permitted to sell drugs out of the apartment, reflecting that Harrell knew Barclay sold drugs. Barclay testified that he was supposed to do work on Harrell's upstairs apartment, and he used some of the profits from his drug sales to fix up the place.

{¶ 88} Blair testified that although he did not personally have any hand-to-hand drug transactions with Harrell, he directly observed Harrell selling methamphetamines to Foster. The first time Blair met Harrell, he and Foster picked up Harrell at Harrell's house on Ludlow Avenue and drove to Logan County to sell a quarter pound of methamphetamine. After the transaction was completed, Harrell shared the profits of the sale with Foster while at his Ludlow Avenue apartment.

{¶ 89} Both Blair and Foster used methamphetamines, but they resold more drugs than they used to maintain their lifestyle. They also purchased methamphetamines from Barclay to use and/or resell. Blair was aware that Barclay obtained his drugs from Harrell. Blair never heard of Harrell using drugs, only selling them.

{¶ 90} From the time that Blair met Foster in 2019 until they were arrested in August 2020, Blair recalled that most of the time that he and Foster met up with Harrell for drugs was at Harrell's house on Ludlow Avenue. Harrell stopped dealing directly with Foster in August 2020 because Foster and Blair were arrested. Once they were released from jail, Harrell refused to supply them because Harrell claimed they were "too hot to mess with." Trial Tr. 637.

{¶ 91} Such evidence served to establish an association-in-fact enterprise with which Harrell was associated and with which he engaged in a pattern of corrupt activity. We conclude that a rational juror could have reasonably inferred from the testimony produced at

29

trial that Harrell's drug trafficking enterprise was ongoing, and that Harrell actively engaged in two or more corrupt activities. We have previously stated that uncharged conduct may constitute the "corrupt activity" underlying a RICO charge because nothing in the RICO statute requires a defendant to be separately indicted for, or convicted of, the underlying corrupt activity. *State v. Johnson*, 1998 WL 57796, *6 (2d Dist. Feb. 13, 1998); R.C. 2931.31(E). "The state simply must prove beyond a reasonable doubt that the defendant's uncharged conduct violated a statute and that the statutory violation was a 'corrupt activity.'" *Id*. at *7. The amounts of methamphetamine involved in the uncharged conduct involving Harrell constituted drug trafficking in violation of R.C. 2925.03 and rose to the level of corrupt activity. Therefore, we overrule Harrell's first assignment of error.

### III. Amended Indictment

{¶ 92} In his second assignment of error, Harrell makes the following argument:

> The trial court erred in permitting the State to amend the indictment under Crim. R. 7(D) to reflect essential facts not in the indictment prepared by the grand jury over the objection by Appellant.

{¶ 93} "The purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same incident." *State v. Buehner*, 2006-Ohio-4707, ¶ 7, citing *Weaver v. Sacks*, 173 Ohio St. 415, 417 (1962), and *State v. Sellards*, 17 Ohio St.3d 169, 170 (1985). Pursuant to Crim.R. 7(D), a trial court may amend an indictment any time before, during, or after a trial, with respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. If the amendment changes the penalty or degree of the charged offense, then the

30

identity of the offense has changed and is not permitted by Crim.R. 7(D). *State v. Davis*, 2008-Ohio-4537, syllabus.

{¶ 94} Crim.R. 7(D) further provides:

If any amendment is made to the substance of the indictment, information, or complaint, or to cure a variance between the indictment, information, or complaint and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impaneled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury.

{¶ 95} While a trial court's decision to grant an amendment is reviewed for an abuse of discretion, a defendant must also show prejudice as a result of the amendment to warrant reversal. *State v. Madding*, 2011-Ohio-3865, ¶ 11 (2d Dist.). "A trial court abuses its discretion when it acts in an unreasonable, arbitrary or unconscionable manner." *State v. Finnerty*, 45 Ohio St.3d 104, 107 (1989).

{¶ 96} Harrell concedes that there was sufficient evidence in the record to support his conviction for Counts Two and Three but claims that the State's amendment of the indictment was improper. Harrell relies on an argument that he alleges he raised in his first appeal but was not considered because the conviction was vacated and the case was remanded for a new trial. The State argues that because Harrell did not adequately raise the issue in his first appeal, the issue is precluded by res judicata. The State argues in the

31

alternative that even if this assignment of error is not precluded by res judicata, it fails on the merits.

{¶ 97} At the conclusion of the State's case-in-chief during Harrell's first trial, the State made an oral motion to amend the indictment on Counts Two and Three. The amendment was an extension of the dates when the offenses were alleged to have occurred. Rather than alleging the events occurred "on or about July 10, 2020," the time frame was expanded to include a continuing course of conduct from July 7, 2020, to July 10, 2020. Counts Two and Three were based on the first drug buy involving the CI, where Harrell fronted 20.78 grams of methamphetamine to the CI, which was then turned over to law enforcement, and $500 of recorded buy money was provided to Harrell to pay off the drug debt. Defense counsel objected, but the trial court overruled his motion and granted the State's request to amend the indictment.

{¶ 98} Whether Harrell preserved his argument or not in his prior appeal, Harrell cannot establish any prejudice to warrant a reversal. Under Crim.R. 7(D), if the amendment was made to the substance of the indictment, Harrell was entitled to move for both a discharge of the jury and a reasonable continuance if he was misled or prejudiced by the amendment, but he did neither. *State v. O'Brien*, 30 Ohio St.3d 122, 126 (1987). Nevertheless, because Harrell's conviction was reversed, he essentially received a continuance to prepare for a new trial based on the amendment. More importantly, neither the name nor identify of the crime was affected by the amendment. Harrell was charged with aggravated trafficking in drugs and aggravated possession of drugs, felonies of the second degree, before and after the amendment. Both the type of drug involved and the amounts alleged in the indictment remained the same before and after the amendment. There is no risk that the jury convicted Harrell based on a completely different crime than

32

that alleged in the indictment. "Ordinarily, precise times and dates are not essential elements of offenses." *Sellards*, 17 Ohio St.3d at 171. "[W]here the inability to produce a specific time or date when the criminal conduct occurred is . . . without material detriment to the preparation of a defense, the omission is without prejudice, and without constitutional consequence." *Id*. at 172. Nothing about the change in dates affected Harrell's defense. Accordingly, Harrell has not demonstrated prejudice.

{¶ 99} Moreover, prior to his retrial, the State raised the issue of the amendment to Counts Two and Three. The State identified the time frame for those two counts as a continuing course of conduct from on or about *July 6, 2020*, to July 10, 2020. The State noted that "Defense counsel is aware of this because he [did] cite that July 6th date in his motion in limine." October 7, 2024 Hearing Tr. 17-18. In response, defense counsel did not object, but rather stated, "That's fine with me." *Id*. at 18. The amendment was granted and the jury for the retrial was instructed of the time frame from July 6, 2020, to July 10, 2020. Harrell did not object to the amendment of the dates in his second trial and does not challenge that amendment on appeal.

{¶ 100} By the time of the retrial, Harrell was fully aware of the evidence and the course of conduct dates upon which the State intended to proceed. Harrell made no objection to the amendment of the time frame for his retrial, and he has not demonstrated prejudice resulting from either amendment. Accordingly, we overrule Harrell's second assignment of error.

## IV. Conclusion

{¶ 101} Having overruled Harrell's assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

33

TUCKER, J., and HANSEMAN, J., concur.